UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SCENTSATIONAL TECHNOLOGIES, LLC,

Plaintiff,

-v-

PEPSICO, INC., PEPSI-COLA TECHNICAL
OPERATIONS, INC., THE QUAKER OATS
COMPANY, STOKELY-VAN CAMP, INC., and
TROPICANA PRODUCTS, INC.,

Defendants.

No. 13-CV-8645 (KMK)

OPINION & ORDER

Appearances:

Melvin C. Garner, Esq.
Cameron S. Reuber, Esq.
Lauren B. Sabol, Esq.
Peter S. Sloane, Esq.
Leason Ellis LLP
White Plains, NY
*Counsel for Plaintiff*

Jerold I. Schneider, Esq.
Joel B. Rothman, Esq.
Schneider Rothman Intellectual Property Law Group
Boca Raton, FL
*Counsel for Plaintiff*

Richard B. Harper, Esq.
Jennifer C. Tempesta, Esq.
Julie B. Albert, Esq.
Robert L. Maier, Esq.
Shannon E. Turner, Esq.
Suzanne M. Hengl, Esq.
Baker Botts L.L.P.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

ScentSational Technologies, LLC ("Plaintiff"), brings this Action against PepsiCo, Inc. ("Pepsi"), Pepsi-Cola Technical Operations, Inc., The Quaker Oats Company ("Quaker"), Stokely-Van Camp, Inc., and Tropicana Products, Inc. ("Tropicana," and collectively, "Defendants"), asserting claims for misappropriation of trade secrets, breach of contract, unfair competition, unjust enrichment, the imposition of a constructive trust, and the correction of inventorship of an issued patent. Over the course of an almost decade-long relationship, Plaintiff contends that it disclosed confidential and trade secret information relating to the development of aromatic food and beverage packaging to Defendants and that Defendants then misappropriated that information for their own benefit. As a result of this alleged misappropriation, Plaintiff contends that it suffered damages in excess of███████████ because it lost out on potentially lucrative business opportunities with The Coca-Cola Company ("Coke"). Before the Court are two Motions brought by Defendants. The first is a Motion for Summary Judgment. (*See* Dkt. No. 108.) The second is a Motion To Strike certain documents Plaintiff filed in opposition to the Motion for Summary Judgment. (*See* Dkt. No. 120.) For the reasons to follow, Defendants' Motion to Strike is denied and its Summary Judgment Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

Plaintiff's predecessor company ScentSational Products, Inc. was founded in 1997 by Steven Landau ("Landau"). (*See* Statement of Undisputed Material Facts in Supp. of Defs.' Mot. for Summ. J. ("Defs.' 56.1") ¶ 40 (Dkt. No. 124); Pl.'s Resp. to Defs.' Rule 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 40 (Dkt. No. 126).) Its primary focus was the invention and

2

commercialization of aroma release food and beverage packaging. (*See* Defs.' 56.1 ¶ 40; Pl.'s 56.1 Resp. ¶ 40.) Landau founded the company after an experience he had while on a ski trip. (*See* Pl.'s Am. Rule 56.1 Statement ("Pl.'s 56.1") ¶ 3 (Dkt. No. 127); *see also* Pl.'s 56.1 Resp. ¶ 42.) After putting on cherry lip balm and drinking from a bottle of water, Landau perceived that the water tasted like cherry. (*See* Declaration of Melvin C. Garner, Esq. ("Garner Decl.") Ex. 144, at 22–23 (Dkt. No. 112).) His goal in forming ScentSational Products was to develop a method to deliver scents in packaging so as to alter a consumer's taste perception while consuming the product contained in the scented packaging. (*See* Pl.'s 56.1 Resp. ¶ 42.) Plaintiff was co-founded by Landau and Barry Edelstein ("Edelstein") in 2002, to continue the work started by ScentSational Products, and holds itself out as the industry leader in developing aromatic packaging technologies for food, beverage, pharmaceutical, and consumer products. (*See* Defs.' 56.1 ¶ 41; Pl.'s 56.1 Resp. ¶ 41.) Plaintiff has a lab on its premises, (*see* Decl. of Steven Landau ("Landau Decl.") ¶ 6 (Dkt. No. 112)), but has limited facilities for manufacturing and research so it relies upon its vendors and strategic partners to gain access to those facilities, (*see* Defs.' 56.1 ¶¶ 47–48; Pl.'s 56.1 Resp. ¶¶ 47–48).

### 1. Plaintiff's Relationship with Defendants

Plaintiff contends that over the course of almost a decade it shared trade secrets with Defendants relating to the development and commercialization of scented packaging. Although the number of trade secrets allegedly disclosed has varied over time, (*see* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Summ. J. Mem.") 18 (Dkt. No. 123)), Plaintiff has settled on prosecuting the disclosure of 11 combination trade secrets: (1) Consumer Study; (2) Orange Juice; (3) Polymer Entrapped or Encapsulated Flavor; (4) Sweet Aroma; (5) Bitter Mitigation; (6) Freshness; (7) Protective Coating; (8) Dosing; (9) Modify No Masking; (10) Secondary

Cover; and (11) Labeling trade secrets. (*See* Garner Decl. Ex. 142; Pl.'s 56.1 ¶ 1.) Plaintiff did not track the costs associated with developing these trade secrets, but spent ███████ conducting the consumer studies that comprise the Consumer Study trade secret. (*See* Garner Decl. Ex. 145; Pl.'s 56.1 ¶ 5.)

During the course of the Parties' dealings they entered into four confidentiality agreements and one funded development agreement. (*See* Pl.'s 56.1 ¶¶ 24, 30, 32–33, 83.) Pursuant to the terms of the confidentiality agreements, the Parties agreed to protect each other's confidential information and limit its disclosure. (*See, e.g.*, Am. Compl. Ex. A (Dkt. No. 33).) The first confidentiality agreement was executed in December 2003, (*see id.*), the second was executed in December 2004, (*see* Am. Compl. Ex. B), the third was executed in July 2005, (*see* Am. Compl. Ex. C), and the final one was executed in February 2010, (*see* Am. Compl. Ex. D). The funded development agreement ███████████████████████████████████ ████████████████████████████ was executed between Plaintiff and Frito-Lay in April 2005. (Garner Decl. Ex. 176; Pl.'s 56.1 ¶ 32.)

Plaintiff's disclosure of trade secrets to Defendants allegedly began in 2001 ████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████ (*See* Garner Decl. Ex. 144, at 240; Pl.'s 56.1 ¶ 23.) Landau disclosed this information because he was under the impression that his disclosures were protected by a confidentiality agreement. (*See* Garner Decl. Ex. 167, at 675–76; Pl.'s 56.1 ¶ 23.) Then, in July and October 2003, Plaintiff sent product samples to Pepsi, (*see* Garner Decl. Exs. 168, 169; Pl.'s 56.1 ¶ 25), and disclosed confidential information to a Pepsi employee in 2004, who in turn shared the information with other Pepsi employees and divisions, (*see* Garner Decl. Ex. 170; Pl.'s 56.1 ¶ 27). Also, in 2005, Plaintiff shared a copy of a

4

consumer study, which comprises the Consumer Study trade secret, with a Frito-Lay employee. (*See* Garner Decl. Ex. 231.)

In December 2006, Bruno Telesca ("Telesca"), then the Principal Engineer at Pepsi, submitted a message through Plaintiff's website requesting information about Plaintiff's products and samples. (*See* Garner Decl. Ex. 185; Pl.'s 56.1 ¶ 40.) Plaintiff sent the samples to Telesca in January 2007. (*See* Garner Decl. Ex. 186; Pl.'s 56.1 ¶ 41.) Plaintiff continued to discuss potential business opportunities with Defendants' employees during 2007. (*See* Pl.'s 56.1 ¶¶ 42–44, 46, 48.) The contacts involved email and telephone correspondence with Garry Kohn and John Steiger ("Steiger"). (*See id.* ¶¶ 42–43.) Landau had a series of phone calls with Steiger, during which he disclosed "elements of and references to" all of Plaintiff's claimed trade secrets. (Decl. of Richard B. Harper in Supp. of Defs.' Mot. for Summ. J. ("Harper Decl.") Ex. 81, at 23–24 (Dkt. No. 109); *see also* Garner Decl. Ex. 199, at 542–43 ("Is it your position that trade secrets that [Plaintiff] is asserting in this case were disclosed during each of those phone calls? A: Yes."); Garner Decl. Ex. 191, at ST-001854.) Then, in January 2008, Plaintiff gave a presentation and met with "a large group of Pepsi employees in Chicago." (*See* Garner Decl. Ex. 198; Pl.'s 56.1 ¶ 52.) The presentation included a slideshow and lasted approximately an hour-and-a-half to two hours. (*See* Garner Decl. Ex. 199, at 550–51.) During his deposition, Landau described the presentation as follows:



Okay. So I presented a conversation regarding the benefits of our technology; I discussed with them the Consumer Study ▮▮▮▮

This was an important pitch that I made that day and I remember making this pitch to them because, again, it's been high on my—on my list and something

I believe is very valuable to—to us and would be valuable to PepsiCo if they did such a thing.

[. . .]

Okay. █████████████████████████████████████

██████████████████████████.

I talked about the orange juice trade secret █████████████████████

████████████████████████████████████████████████

I also discussed the different methods of making different flavor polymer and what kind of blends are acceptable, ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████

I talked about the freshness trade secret, ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

I've talked about the dosing trade secret ████████████████

████████████████████████████████████████████████



I talked about scented liners ███████ ██

I talked about our formulation guidelines█

[. . .]
Okay. I also talked about the encapsulated aromatic trade secret, ████

I also talked about the improved consumer experience███

Additionally to this—and I would want to reference the other one, but I do remember, aside from what's written here is that I did talk about the Consumer Studies that we've done—I'm not sure if I covered that—yeah, that's here—so I did talk about the Consumer Study and what that means, the importance of it.

There was something else and it just went right out of my head, but this was, you know, this was a fairly—very strong in my memory meeting.

(*Id.* at 555–63.) Landau could not recall who attended the meeting, (*see id.* at 550), but was later informed that Ruowei Strange ("Strange") listened to the presentation over the conference line, (*see* Garner Decl. Ex. 200, at ST-002497). Additionally, metadata indicates that Telesca and

Peter Given ("Given"), a Pepsi scientist, possessed copies of the slideshow. (*See* Pl.'s 56.1 ¶ 52.)

Shortly after the January 2008 presentation, in March 2008, Strange contacted Landau to request product samples. (*See* Garner Decl. Ex. 200, at ST-002497; Pl.'s 56.1 ¶ 57.)  Strange confirmed that she received Plaintiff's samples during a phone call on April 9, 2008. (*See* Garner Decl. Ex. 200, at ST-002497; Pl.'s 56.1 ¶ 61.)

Contact between the Parties remained limited between the latter half of 2008 and October 2009. Then, on March 25, 2010, Plaintiff gave a presentation to Pepsi's research and development employees. (*See* Pl.'s 56.1 ¶ 84.) Landau allegedly disclosed information about Plaintiff's trade secrets during this presentation. During his deposition, Landau describe the disclosure of Plaintiff's trade secrets as follows:

> Q: Can you tell me with specificity what words you used to disclose any of your trade secrets at that meeting?
>
> A: Yeah, I mean, again, I remember this meeting pretty well and I remember giving a very exhaustive comprehensive overview, and, again, because they continued to ask questions about—about let down ratios and, you know,

---

[1] Plaintiff asserts that the consumer studies also were provided to ▮▮▮▮ in 2009, but this assertion is not supported by the cited document. (*See* Garner Decl. Ex. 232.)

polymer blends and whether coatings are needed and how we run it in the plant. There was just a lot of questions in this meeting.

[. . .]

Q: Do you remember specifically in the words they used any of the questions that were asked?

A: I mean, people asked me—I mean, I remember questions regarding—regarding material blends, regarding need for coatings, regarding the flavor development process and how we manufacture. Again, I did not—in this case I did not share with them our manufacturing guidelines or our formulation guidelines, but I did discuss some of the information of how we manufacture and the way that we work with—the way we work with the flavor houses and even information regarding, you know, ███████████████████████████████████████
███████████████

[. . .]

Q: Do you recall anything else specifically about what you said in terms of the words you used to disclose any of the trade secrets identified here?

A: First of all, there is one thing that really stands out in my mind because it was really the only time I ever disclosed this specific trade secret, and it was in a side-bar conversation with one or two Pepsi people after the presentation, and they were asking me about liner systems and—and if we—if we had—you know, what other options we had explored and looked at.



So it was a very quick side-bar. They were kind of asking things that we could do. I thought that they were going somewhere with it. So I talked about it. We were under confidentiality.

(Garner Decl. Ex. 203, at 1273–74, 77–79.) An attendee at the meeting, Lee Nicholson ("Nicholson") took handwritten notes during the presentation and drafted an internal memo

about what was discussed. (*See* Garner Decl. Ex. 227; Garner Decl. Ex. 228, at PEP0089639–45; Pl.'s 56.1 ¶ 85.) Plaintiff contends that Nicholson's notes refer to aspects of the Freshness, Sweet Aroma, Polymer Entrapped or Encapsulated Flavor, Orange Juice, Protective Coating, Secondary Cover, Consumer Study, Labeling, and Modify No Masking trade secrets. (*See* Pl.'s 56.1 ¶ 85.) The internal memo, which contained Plaintiff's confidential information, was distributed to Pepsi employees not in attendance at the meeting. (*See id.* ¶ 86.) According to the internal memo, Given attended the presentation. (*See* Garner Decl. Ex. 227; Pl.'s 56.1 ¶ 84.)

In total, Plaintiff generated ▮▮▮▮ in revenues from Defendants. (*See* Defs.' 56.1 ¶ 63; Pl.'s 56.1 Resp. ¶ 63.)

## 2. Defendants' Development of Scented Packaging and Patents

To protect the work conducted during this initial project, Pepsi filed a non-provisional patent application, which issued on August 15, 2000. (*See* Defs.' 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.) Given is listed as one of the patent's inventors. (*See* Defs.' 56.1 ¶ 16; Pl.'s Resp. 56.1 ¶ 16.)

10

run and the project "died on the vine." (Harper Decl. Ex. 17, at 59; Defs.' 56.1 ¶ 17; Pl.'s 56.1

Resp. ¶ 17.)

[REDACTED] One of the meetings occurred on March 5, 2008, and was attended by

"Mike," Havekotte, Covarrubias, and Strange. (*See* Garner Decl. Ex. 205, at PEP0098856.) The

---

[2] Plaintiff denies this statement of fact based on a faulty interpretation of the fact at issue.
[REDACTED] Plaintiff disputes this fact on the ground that the referenced studies were not conducted until after January 2008. (*See* Pl.'s 56.1 Resp. ¶ 22.) The date of the studies is irrelevant. Defendants' statement focuses on the content of the studies rather than their date.

next day, Strange contacted Landau to obtain samples of Plaintiff's products. (*See* Garner Decl. Ex. 200, at ST-002497.) ███████████████████████████████████████

███████████████████████████████

Pepsi pursued patent protection for ███████████████████████ work. On September 3, 2008, Pepsi filed a provisional patent application for the work performed in 2007 and 2008. (*See* Defs.' 56.1 ¶ 28; Pl.'s 56.1 Resp. ¶ 28.) On August 27, 2009, Pepsi filed a non-provisional patent application claiming priority to the provisional application and adding information about the work performing during the intervening year. (*See* Defs.' 56.1 ¶ 29; Pl.'s 56.1 Resp. ¶ 29.) The patent application published on March 4, 2010, listing Havekotte and Covarrubias as inventors (the "'245 Publication"). (Harper Decl. Ex. 48; Defs.' 56.1 ¶ 30; Pl.'s 56.1 Resp. ¶ 30.) Plaintiff alleges that this patent application misappropriates its "compilation trade secrets." (Pl's 56.1 Resp. ¶ 30 (emphasis omitted).)

████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████

████████████████████████████████████████
[3] ████████████████████████████████████████
████████████████████████████████████████████

On July 7, 2010, Pepsi filed a non-provisional patent application regarding the work performed in 2009 and 2010 on aroma release technology, with a particular focus on the "multi-layer film technology." (Defs.' 56.1 ¶ 34; *see also* Pl.'s 56.1 Resp. ¶ 34.) Plaintiff alleges that the patent application contains and discloses Plaintiff's trade secrets. (*See* Pl.'s 56.1 Resp. ¶ 34.) The patent application was published on January 12, 2012 (the "'909 Publication"), and was issued on July 2, 2013 (the "'637 Patent"). (*See* Defs.' 56.1 ¶ 35; Pl.'s 56.1 Resp. ¶ 35.) Zhang and Given are listed as the inventors. (Harper Decl. Ex. 59, at PEP0097114.) Plaintiff alleges that this patent misappropriates its trade secrets. (*See* Pl.'s 56.1 Resp. ¶ 36.)

On September 1, 2011, Pepsi filed a non-provisional patent application regarding the work performed in 2009 and 2010, with a particular focus on its "double coated gelatin capsule technology." (Defs.' 56.1 ¶ 37; *see also* Pl.'s 56.1 Resp. ¶ 37.) The patent application published on March 7, 2013 (the "'551 Publication"). (*See* Defs.' 56.1 ¶ 38; Pl.'s 56.1 Resp. ¶ 38.) Zhang and Given are listed as inventors. (*See* Harper Decl. Ex. 62, at PEP0097122.) Zhang informed Pepsi that he conceived of the invention claimed in this application on May 27, 2009, (*see* Garner Decl. Ex. 212, at PEP0097631), which would have been within days or weeks of when he joined Pepsi, (*see* Garner Decl. Ex. 211, at 24 (Zhang testifying that he joined Pepsi in May 2009)). Plaintiff alleges that the application misappropriates its trade secrets. (*See* Pl.'s 56.1 Resp. ¶ 38.)

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

Plaintiff attributes Pepsi's failure to commercialize this research to Pepsi's inability to develop a feasible delivery system. (*See* Pl.'s Resp. 56.1 ¶ 39.)

The inventors listed in Defendants' patent applications and patents—Havekotte, Covarrubias, Given, and Zhang—do not recall Plaintiff or speaking with any of its representatives. (*See* Defs.' 56.1 ¶ 68; Pl.'s 56.1 Resp. ¶ 68.) However, Plaintiff's presentations and studies were found in their files. (*See* Pl.'s 56.1 Resp. ¶ 68.) Landau, Plaintiff's founder, may have had telephone calls with one or more of Havekotte, Covarrubias, and Given, but he could not recall the specifics, and may have had direct contact with Given. (*See* Defs.' 56.1 ¶ 66; Pl.'s Resp. 56.1 ¶ 66; *see also* Harper Decl. Ex. 65, at 224 ("Q: Aside from that meeting, do you think you've ever had any direct communications with Mr. Given? A: I do.").) Plaintiff also insists that it is possible that Landau had contact with these Pepsi employees at one of the presentations he gave, but again, Landau has no specific recollection of ever meeting them. (*See* Pl.'s 56.1 Resp. ¶ 67.)

### 3. Plaintiff's Relationship with Coke

In March 2010, Plaintiff met with Coke to discuss how Plaintiff's technology could benefit Coke's products. (*See* Garner Decl. Ex. 245.) In August 2010, Plaintiff and Coke executed a Master Agreement for External Professional Services for a project entitled "Project ▮▮▮▮" (*See* Garner Decl. Ex. 247; *see also* Defs.' 56.1 ¶ 70; Pl.'s 56.1 Resp. ¶ 70.) The project's focus was on three ways in which Plaintiff could apply its technology to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (*See* Defs.' 56.1 ¶ 70; Pl.'s 56.1 Resp. ¶ 70.) Eventually, Plaintiff and Coke settled on ▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See* Pl.'s 56.1 ¶ 104.)

In the early stages of Phase 1 of the project, Plaintiff encountered several technical issues. (*See* Defs.' 56.1 ¶ 71; Pl.'s 56.1 Resp. ¶ 71.) Some of the early samples Plaintiff sent to Coke for testing were inconsistent and contained off-notes. (*See* Harper Decl. Ex. 91, at ST-026753;

*see also* Defs.' 56.1 ¶ 71; Pl.'s 56.1 Resp. ¶ 71.) Plaintiff also encountered difficulty ensuring that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ would adhere to product packaging when exposed to water. (*See* Defs.' 56.1 ¶ 73; Pl.'s 56.1 Resp. ¶ 73.) One Coke employee noted that after he got his finger wet, he was able to rub ▮▮▮▮▮▮ off of the samples. (*See* Harper Decl. Ex. 93, at ST-026591.) Despite these issues, a Coke employee, ▮▮▮▮▮▮▮▮▮▮ told Plaintiff that Coke would use Plaintiff for its ▮▮▮▮▮▮▮▮▮▮▮▮ and planned to launch the ▮▮▮▮▮▮▮▮ product line in the first quarter of 2012. (*See* Garner Decl. Ex. 253, at ST-068500.) If that launch was successful, Coke indicated a willingness to expand the product to other brands, such as ▮▮▮▮, which sells ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See* Garner Decl. Ex. 254, at ST-011523.)

▮▮▮▮ also confirmed that Plaintiff successfully completed Phase 1 of the project. (*See* Garner Decl. Ex. 258, at 118 ("Q: So is it accurate to say that [Plaintiff] successfully completed the Phase 1 work with Coke? [. . .] A: Yes.").) On July 11, 2011, Plaintiff sent Coke a proposed development agreement for Phase 2. (*See* Pl.'s 56.1 ¶ 113.) Landau and ▮▮▮▮ spoke the next day about moving the project forward. (*See* Harper Decl. Ex. 92, at ST-042339.) In response to an email summarizing the contents of that phone call, ▮▮▮▮ responded:



> Thank you for sending your notes of the call to me. However, there needs to be clarification on our conversation concerning Phase I.
> Phase I expectations were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As we discussed in our face to face meeting in Atlanta, the KO team would make [the] decision to move forward or not into Phase II development if pending successful results. Our policy has always been that both parties sign the agreement as a way of accepting the terms of the agreement. We have NOT signed the Phase II agreement at this time. In relation to the cost questions, Phase I was to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
> Based on our conversation today this has not been done by [Plaintiff], and my request was that we need to continuously validate decisions with data from any

testing that is being completed. I am concerned at this point, because any request of data collection from [Plaintiff] has resulted in lengthy email responses, that are not addressing the simple providing [sic] the data requested. In short, my request is simply for the data collected in Phase I so that we are able to track all changes being made. The data will be used as history for any future quality records.

(*Id.* at ST-042338.) Plaintiff supplied the requested information on July 22, 2011, in addition to the estimated cost per unit, (*see* Harper Decl. Ex. 100), but ███ remained dissatisfied with Plaintiff's response, (*see* Harper Decl. Ex. 96, at 146). Project ███ nonetheless continued to move forward. On August 11, 2011, ███ told Plaintiff that the Vice President of Coke's ███ ███ was "fully on board" and that the products were likely to be sold globally. (Garner Decl. Ex. 262, at ST-036045.)

On September 12, 2011, Plaintiff met with ███ and other Coke employees to discuss Phase 2. (*See* Garner Decl. Ex. 264; Pl.'s 56.1 ¶ 117.) Notes from the meeting reflect that the "project . . . has satisfied the requirements of Phase 1." (Garner Decl. Ex. 264, at ST-009981.) However, on September 20, 2011, Plaintiff received an email from ███████████ stating that "███ has put [the project] **ON HOLD** indefinitely until [it] ha[d] an opportunity to fully review the current agreements." (Garner Decl. Ex. 266, at ST-011560.) On November 4, 2011, Plaintiff had a conference call with Coke's legal department. (*See* Pl.'s 56.1 ¶ 122.) Notes from the call reflect that the participants discussed one of Pepsi's patent applications. (*See* Garner Decl. Ex. 268, at ST-003519.) Landau explained that Pepsi's application was likely to be denied, but ████████████ ████████████ (*Id.* at ST-003519–20.) At some point, Landau was informed that Coke's patent concerns were related to Pepsi's '245 Publication. (*See* Garner Decl. Ex. 167, at 913–14.) On November 16, 2011, ███ informed Plaintiff that Project ███ would not be moving forward "due to risks that have been identified ████████████

███████." (Garner Decl. Ex. 270, at ST-012955.) During his deposition, ███ clarified that it "was not just any one patent or patent application that created the risk inconsistent with Coke's IP policies." (Harper Decl. Ex. 96, at 192.) ███ estimated that Project ███ had a 35% chance of producing a product that could be commercialized. (*Id.* at 196.)

Project ███ was not Plaintiff's only project with Coke. Starting in 2010, Plaintiff had discussions with ████████ about a project involving ████████████. (*See* Defs.' 56.1 ¶ 93; Pl.'s 56.1 Resp. ¶ 93.) As of July 2011, ███ said that Coke ████████ remained interested in pursuing this project, but wanted first to see Project ███ outcome. (*See* Garner Decl. Ex. 276, at ST-036011.) Plaintiff contacted ████████ in January 2012 about moving the project forward, admitting that Plaintiff had just recently developed "a commercially ready ████████." (Garner Decl. Ex. 277, at ST-003575.) In response to Plaintiff's communications, ████████ requested information about the "IP of the ███ ███" and asked whether there was an "IP risk related" to Plaintiff's technology. (*Id.* at ST-003574.) ████████ ceased discussions with Plaintiff after this communication. (*See* Pl.'s 56.1 ¶ 134.)

B. Procedural History

Plaintiff filed the Complaint on December 5, 2013. (*See* Dkt. No. 1.) Plaintiff filed an Amended Complaint on July 1, 2014. (*See* Dkt. No. 33.) Defendants answered on October 22, 2014. (*See* Dkt. No. 43.) After several extensions, (*see* Dkt. Nos. 55, 76, 83, 94), discovery closed on April 1, 2016, (*see* Dkt. No. 94). Pursuant to a Motion Scheduling Order and a subsequent extension, (*see* Dkt. Nos. 104–05), Defendants filed their Motion for Summary Judgment and supporting papers on January 24, 2017. (*See* Dkt. No. 108.) Following an extension request, (*see* Dkt. No. 110), Plaintiff filed its opposition on March 22, 2017, (*see* Dkt.

No. 112). Prior to filing their reply papers, Defendants requested permission to file their Motion To Strike. (*See* Dkt. No. 115.) Plaintiff opposed this request. (*See* Dkt. No. 116.) Defendants' reply papers were filed on April 12, 2017. (*See* Dkt. No. 119.) Pursuant to a memo endorsement, (*see* Dkt. No. 118), Defendants filed the Motion To Strike on April 21, 2017, (*see* Dkt. Nos. 120–21). Plaintiff filed opposition papers on May 4, 2017. (*See* Dkt. No. 122.) Most of the Parties' submissions have been filed under seal. Redacted copies of some of the filings can be accessed on the Docket. (*See, e.g.*, Dkt. No. 124.)

## II. Motion To Strike

Before turning the merits of Defendants' Summary Judgment Motion, the Court must first address Defendants' Motion to Strike, which was filed shortly after Plaintiff submitted its opposition to the Motion for Summary Judgment. (*See* Dkt. No. 120.) Included with its motion papers, Plaintiff submitted a Declaration and Rebuttal Report of Dr. Keith R. Cadwallader ("Dr. Cadwallader"), (*see* Dkt. No. 112), and a Declaration of Dr. Claire Koelsch Sand ("Dr. Sand"), (*see id.*). Defendants argue that the declarations should be stricken because they contain opinions that were not disclosed during discovery, go beyond the scope of the expert reports actually disclosed, and, in some instances, contradict opinions expressed in the original reports. (*See* Defs.' Mem. of Law in Supp. of Mot. To Strike ("Defs.' Mot. To Strike Mem.") 1 (Dkt. No. 121).) Defendants make a strong argument, but the Court need not resolve this dispute at this stage of the proceeding. Setting aside these declarations, which the Court has done in consideration of Defendants' Summary Judgment Motion, Plaintiff has proffered just enough evidence to thwart summary judgment. Accordingly, Defendants' Motion to Strike Dr. Cadwallader's and Dr. Sand's declarations is denied without prejudice as unripe. If a trial becomes necessary, Defendants may file a motion in limine.

Defendants also seek to strike Plaintiff's Local Rule 56.1 statement on the ground that it is not permitted by the Court's rules. (*See* Defs.' Mot. To Strike Mem. 1.) Plaintiff has submitted two documents under the guise of Rule 56.1: (1) a response to Defendants' Rule 56.1 statement, (*see* Dkt. No. 126), and (2) a Rule 56.1 statement ("Plaintiff's Rule 56.1 Statement"), (*see* Dkt. No. 127). Under Rule 56.1, a party filing a motion for summary judgment must file a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The non-moving party must respond to the moving party's Rule 56.1 statement and may include "additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(b). Defendants argue that Plaintiff's Rule 56.1 Statement should be stricken because Plaintiff should have included the facts cited therein in its response to Defendants' Rule 56.1 statement. (Defs.' Mot. To Strike Mem. 9.) While Defendants are technically correct, the Court will not strike Plaintiff's Rule 56.1 Statement simply because Plaintiff filed two documents rather than one. The Court will consider the facts contained in Plaintiff's Rule 56.1 Statement to the extent that they are not conclusory and are supported by the record.

### III. Summary Judgment

Defendants contend that they are entitled to summary judgment on all of Plaintiff's claims because Plaintiff has not proffered evidence sufficient to support its claims. Defendants argue that Plaintiff's misappropriation of trade secrets claim should not proceed to trial because there is no evidence that Plaintiff ever possessed any of its 11 claimed trade secrets, that Defendants misappropriated those trade secrets, or that Plaintiff suffered damages as a result.

The other claims must be dismissed, Defendants argue, because the same defects present in the misappropriation claim doom them as well.

A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PricewaterhouseCoopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for

21

trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be to sniff out and dispose of factually unsupported claims. *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004).

## B. Misappropriation of Trade Secret

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014) (alteration and internal quotation marks omitted). "To succeed on a claim for the misappropriation of trade secrets under New York law, a party

must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).[4] Damages are measured "either by the plaintiff's losses, or the profits unjustly received by the defendant." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991) (citations omitted).

In determining whether information constitutes a trade secret, New York courts have considered:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Faiveley Transp.*, 559 F.3d at 117 (internal quotation marks omitted). Particularly important for purposes of this Motion, the "existence of a trade secret is a question of fact." *Big Vision*, 1 F. Supp. 3d at 267 (internal quotation marks omitted).

Defendants' first contention is that the Court need not consider whether Plaintiff possessed a trade secret because Plaintiff has produced "no objective evidence" to support its claims. (*See* Defs.' Summ. J. Mem. 23.) More specifically, Defendants focus on the lack of

---

[4] The Parties assume that New York law governs this dispute. The Court will do the same. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (alteration and internal quotation marks omitted)); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995) ("Because both parties agree that New York cases are controlling, we shall assume that New York law governs this diversity action.").

written or documentary evidence establishing the existence of Plaintiff's trade secrets. (*See id.*)[5]

Defendants, however, provide no support for the documentary-evidence requirement it seeks to

impose on Plaintiff. Indeed, "[w]hether information is part of a person's casual memory is not

determinative of whether something is a trade secret." *B.U.S.A. v. Ecogloves, Inc.*, No. 05-CV-

9988, 2006 WL 3302841, at *4 (S.D.N.Y. Jan 31, 2006). The Court thus declines to impose

such a requirement on Plaintiff and will instead rely on "any material that would be admissible at

trial" in ruling on Defendants' Summary Judgment Motion. *Yesh Music, LLC v. Amazon.com,*

*Inc.*, — F. Supp. 3d —, 2017 WL 1319760, at *3 (E.D.N.Y. Apr. 8, 2017) (internal quotation

marks omitted).

Although Landau admitted that Plaintiff does not possess a "laboratory notebook that

specifically lays out the entire process from beginning to end" for each claimed trade secret,

(Harper Decl. Ex. 65, at 108), Landau has provided a 75-paragraph declaration with citations to

specific documents that support Plaintiff's claim that it possessed trade secrets during the

relevant time period, (*see generally* Landau Decl.). At trial, Landau "intend[s] to testify

regarding [Plaintiff's] creation and possession of its trade secrets," (*id.* ¶ 11), information which

Defendants learned during discovery, (*see* Garner Decl. Exs. 145, 157). The exhibits Landau

references explain how and when each element of each trade secret was created. (*See* Garner

Decl. Exs. 145, 157.) Defendants are aware of what Plaintiff claims its trade secrets to be

because Plaintiff provided an 80-page document describing each trade secret. (*See* Garner Decl.

---

[5] In their reply memorandum, Defendants double down on this argument. (*See* Defs.' Reply Mem. in Supp. of Mot. for Summ. J. 1 (Dkt. No. 128) ("[Defendants] challenged [Plaintiff] to point to <u>any</u> objective evidence of the possession or communication of <u>any</u> of its claimed trade secrets . . . ."); *id.* at 5 ("[Plaintiff] and its principal have had countless opportunities to point to objective evidence of any combination trade secret asserted, and they have failed to create a material issue of fact that [Plaintiff] actually possessed its claimed combination trade secrets.").)

Ex. 142.) Based on Landau's testimony and the documentary evidence Plaintiff has proffered, a reasonable jury could conclude that Plaintiff possessed the information that constitutes its claimed combination trade secrets.

Moving on to the merits, Defendants challenge Plaintiff's misappropriation claim at every step of the analysis. They contend that Plaintiff does not possess actionable trade secrets, that even if Plaintiff does possess actionable trade secrets, Defendants did not misappropriate them, and finally, that even if Plaintiff can satisfy the other elements, Defendants did not cause Plaintiff any injury. (*See* Defs.' Summ. J. Mem. 22–37.) The Court will address each of these arguments in turn.

### 1. A Reasonable Jury Could Conclude Plaintiff Possesses Trade Secrets

The Court's analysis begins with the six factors that New York courts traditionally consider when determining whether a plaintiff possesses a trade secret. Defendants devote all of one footnote to discussing these factors, (*see* Defs.' Summ. J. Mem. 25 n.6), but expend several pages addressing three requirements Defendants refer to as the "*Integrated Cash* requirements." Defendants divined these requirements from the Second Circuit's decision in *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171 (2d Cir. 1990), where the court noted that "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Id.* at 174 (internal quotation marks omitted). The Second Circuit relied on this description while discussing the six factors that New York courts traditionally consider in determining whether a trade secret exists. Thus, the Court will consider the "*Integrated Cash* requirements" as part of the traditional six-factor analysis.

### a. The Extent to which the Information is Known Outside of the Business

Whether information is secret "is generally a question of fact." *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 787 (S.D.N.Y. 2008) (internal quotation marks omitted). However, "it is . . . well-established that 'information that is public knowledge or that is generally known in an industry cannot be a trade secret,' including information that is available in publications." *Big Vision*, 1 F. Supp. 3d at 270 (quoting *Ruckelhaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)); *see also Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05-CV-9292, 2008 WL 463884, at *12 n.10 (S.D.N.Y. Feb. 20, 2008) ("[M]atters of general knowledge in an industry are by definition not trade secrets."). Defendants contend that Plaintiff's claimed trade secrets are known in the industry and have proffered the expert report of Dr. Joseph H. Hotchkiss ("Dr. Hotchkiss") in support of this argument. (*See* Defs.' Summ. J. Mem. 28; Harper Decl. Ex. 2 ("Hotchkiss Report").) In his report, Dr. Hotchkiss opines that "Plaintiff's alleged trade secrets consist of information that was generally known in the industry or available in the public domain." (Hotchkiss Report ¶ 64.) The report also includes an exhibit that "breaks down each component of each of Plaintiff's alleged trade secrets and then indicates where the public domain discloses the component." (*Id.* ¶ 66.) In total, Hotchkiss spent "60 to 70 hours" searching for the information that went into the report. (Garner Decl. Ex. 279, at 33.)

Plaintiff argues that the Court should not put much weight behind Dr. Hotchkiss's analysis because Dr. Hotchkiss does not address the ultimate question: "whether the compilation, not its individual elements, is a protectable trade secret." (*See* Pl.'s Mem. of Law in Supp. of its Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Summ. J. Opp'n") 20 (Dkt. No. 125) (emphasis omitted).) Indeed, Dr. Hotchkiss did not find a single source that discloses all of the components of any of Plaintiff's compilation trade secrets, despite spending over 60 hours researching the

issue. By way of example, Dr. Hotchkiss found that the component parts of the Polymer Entrapped trade secret were disclosed in a combination of 17 different references. (*See* Hotchkiss Report Ex. C, at 14–32.)

The Court finds Plaintiff's arguments persuasive enough to clear this hurdle. Dr. Hotchkiss's element-by-element analysis says little about whether Plaintiff's trade secrets are known in the industry. *See Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) ("[T]he [district] court's holding that the four design elements were not novel or original does not address [the] [plaintiff's] claim that the *combination* of the elements is a trade secret."); *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 437–38 (S.D.N.Y. 1996) ("[The] [d]efendants' exhaustive survey of prior art and the expert's reports all suggest that many features cited by [the] plaintiff as trade secrets in 1987 were at the time generally known and already implemented in various computer products. However, these submissions do not permit summary judgment because . . . the submissions do not adequately address [the] plaintiff's claim to trade secret protection in the *combination* of all of the cited features in the [plaintiff's] prototypes."); *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1230 (W.D.N.Y. 1994) ("Even had the defendants succeeded in proving that all of the individual elements of information relating to [the plaintiff's] single-screw technology were 'out there' in the public domain, they would still have had to explain why the synergistic combination of such elements into a unified whole, capable of producing working and commercially-feasible single-screw compressors, should not be afforded trade secret protections.").

Putting aside the deficiencies Plaintiff has identified in Dr. Hotchkiss's report, there exists a dispute between the Parties' experts on whether Plaintiff's trade secrets are generally known. Based on his "knowledge, experience, review of documents produced in this case, and

communications with . . . Landau," (Letter from Melvin C. Garner, Esq., to Court (Apr. 6, 2017) ("Garner Letter") Ex. A ("Cadwallader Supplemented Expert Report") ¶ 57 (Dkt. No. 116)), Dr. Cadwallader opined that Plaintiff's trade secrets "are not generally known in the industry," (*id.* ¶ 33).[6] Plaintiff will have to contend with the fact that Dr. Cadwallader did not conduct his "own search of the literature" even though he "usually would," (Harper Decl. Ex. 132, at 248), but his report is relevant to the extent that he reviewed documents Dr. Hotchkiss now claims constitute disclosures of trade secret information, such as Landau's press releases.

Plaintiff additionally has offered testimony from a 

(*See* Garner Decl. Ex. 158, at 92, 108.) Plaintiff's evidence on this point is limited, but it is sufficient to survive Defendants' Motion for Summary Judgment. Based on the proffered evidence, a reasonable jury could conclude that Plaintiff's trade secrets were in fact secret.

A second component of Defendants' argument in relation to this factor is that there is a dearth of evidence supporting Plaintiff's position that its trade secrets are unique. (*See* Defs.' Summ. J. Mem. 26.) In making this argument, Defendants focus on a specific section of Landau's deposition testimony. During his deposition, Landau testified that he could not recall the "aha moment" with respect to when the trade secrets were created. (*See* Harper Decl. Ex. 65, at 157.) This testimony does not reveal that Plaintiff's trade secrets are not unique, it merely

---

[6] Although Defendants have sought to strike Dr. Cadwallader's declaration from the record, they have not sought to strike the expert report he prepared during discovery. Therefore, the Court may rely on the opinions expressed in the expert report.

reveals that Landau could not recall the precise date on which the trade secrets were created. In any event, the time periods during which Plaintiff developed the alleged trade secrets were provided to Defendants during discovery. (*See* Garner Decl. Exs. 145, 157.)

With respect to the perceived dearth of evidence, Defendants make a strong point. However, the limited evidence Plaintiff has proffered is sufficient to create genuine disputes of material fact. First, Dr. Cadwallader opined that Plaintiff's trade secrets are unique. (*See* Cadwallader Supplemented Expert Report ¶¶ 29, 30, 66.) Second, ██████████████ ██████████████████████████████ (Garner Decl. Ex. 158, at 92, 120.)

████████████████████████████████████████

████ This evidence, while limited, is sufficient to survive Defendants' Summary Judgment Motion.

Accordingly, this factor weighs in favor of finding that Plaintiff possesses trade secrets.

### b. The Extent to which the Information is Known within the Business

Plaintiff contends that only Landau and Edelstein know Plaintiff's trade secrets. (*See* Pl.'s Summ. J. Opp'n 26.) Defendants state only that "it is difficult to ascertain knowledge of the trade secrets within the business." (Defs.' Summ. J. Opp'n 25 n.6.) Given that Plaintiff's assertion is uncontested, this factor weighs in favor of finding that Plaintiff possesses trade secrets.

### c. The Measures Taken to Guard the Secrecy of the Information

"Plaintiff must show that it took substantial measures to protect the nature of its secret information." *Big Vision*, 1 F. Supp. 3d at 267 (internal quotation marks omitted). There is sufficient evidence in the record demonstrating the efforts Plaintiff takes to protect its trade secrets. Such security measures include:

requiring non-disclosure agreements with third parties before disclosing any trade secrets; prior to making disclosures during meetings and calls, advising all participants that the information being disclosed is deemed Proprietary/Confidential Information in accordance with the executed non-disclosure agreement; disclosing information only on a need-to know basis to third parties under non-disclosure agreements; notifying third parties and employees orally and in writing that [Plaintiff's] trade secrets were confidential; storing physical embodiments of [Plaintiff's] trade secrets in secure and locked offices and homes; not reducing [Plaintiff's] full body of trade secrets to writing; and utilizing electronic security measures such as computer and email passwords to protect documents containing trade secret information.

(Garner Decl. Ex. 151, at 6.) Consistent with these measures, Plaintiff and Defendants executed four confidentiality agreements, (*see* Am. Compl. Exs. A–D), and Plaintiff reminded Defendants that its trade secrets were confidential, (*see* Garner Decl. Ex. 172, 175, 186). Defendants do not contest that Plaintiff took these measures to protect its trade secrets. Accordingly, this factor weighs in favor of finding that Plaintiff possesses trade secrets.

### d. The Value of Plaintiff's Trade Secrets

Pursuant to *Integrated Cash*, Plaintiff must demonstrate that its trade secrets "afford[] [it] a *competitive advantage*." 920 F.2d at 174 (emphasis added); *see also Big Vision*, 1 F. Supp. 3d at 257 ("A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain *an advantage over competitors who do not know or use it*." (emphasis added) (alteration and internal quotation marks omitted)). Defendants argue that Plaintiff has not satisfied this requirement because Plaintiff has not proffered any evidence indicating the "economic advantage" of the claimed trade secrets. (*See* Defs.' Summ. J. Mem. 27.)[7] Specifically, Defendants note that Edelstein

---

[7] In reply, Defendants rely on an out-of-circuit case to support its "economic value" argument. *See Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 10 (D.D.C. 2004). *Catalyst* is unhelpful because it relies upon the District of Columbia's code to determine whether the defendants misappropriated the plaintiff's trade secrets.

stated that Plaintiff does not track revenue by trade secret or have specific valuations for each individual trade secret, (*see* Harper Decl. Ex. 64, at 244–45 ("Q: With respect to trade secrets, [Plaintiff] has not conducted any valuations of those alleged trade secrets over time; correct? A: Correct. No formal valuations. Q: Any informal? A: Actually, no informal either.")), and argue that none of Plaintiff's experts offered an opinion as to the economic value of Plaintiff's claimed trade secrets, citing the deposition testimony of Dr. Sand and Wayne Hoeberlein ("Hoeberlein"), Plaintiff's expert on damages, (*see* Defs.' Summ. J. Mem. 27–28). Defendants' focus on *economic advantage*, however, is misplaced. The Court finds no such requirement in the law; *Integrated Cash* requires only *competitive advantage*.

With respect to competitive advantage, Plaintiff has proffered the testimony of ████, (*see* Garner Decl. Ex. 158, at 120), and Dr. Cadwallader's supplemental expert report, in which Dr. Cadwallader opines that Plaintiff's technology gives it "an opportunity to obtain an advantage over competitors who do not know or use it," (Cadwallader Supplemented Expert Report 11). Thus, Plaintiff has proffered information sufficient to pass the smell test on this factor.

### e. The Amount of Money/Effort Expended in Developing the Information

Plaintiff paid ████ to conduct the consumer studies that comprise the Consumer Study trade secret, (*see* Garner Decl. Ex. 145, at 2), and Landau claims he spent "several years" of "numerous trials and errors" perfecting Plaintiff's technology, (Garner Decl. Ex. 144, at 31). The fact that Plaintiff's trade secrets took several years to develop could permit a reasonable jury to conclude that Plaintiff expended substantial effort creating its trade secrets. *See Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, No. 14-CV-8467, 2016 WL 5416498, at *5 (S.D.N.Y.

Sept. 28, 2016) (denying summary judgment because the fact that the plaintiff's trade secret "took several years to develop" created a dispute of material fact regarding whether the plaintiff possessed a trade secret). Thus, this factor weighs in favor of finding that Plaintiff possesses actionable trade secrets.

### f. The Ease/Difficulty of Properly Acquiring/Duplicating the Information

Defendants contend that Plaintiff's trade secrets are easily acquired or duplicated because they are generally known in the industry and that Defendants' knowledge of aroma infused packaging far surpasses that of Plaintiff. (*See* Defs.' Summ. J. Mem. 25 n.6.) Disputed issues of material fact preclude the Court from adopting Defendants' conclusions. As already noted, there are genuine disputes of material fact with respect to whether Plaintiff's information is generally known in the industry. Furthermore, whether Defendants independently developed the information relating to Plaintiff's trade secrets is highly contested. Plaintiff's position is that but for Plaintiff's disclosures of its trade secrets, Defendants never would have discovered the technology Defendants sought to patent, (*see* Pl.'s Summ. J. Opp'n 1 ("Once [Plaintiff's] technology bridged the knowledge gaps that Pepsi's best and brightest minds could not, Pepsi scientists began disseminating and testing [Plaintiff's] solutions for mass consumption across numerous business units.")); Defendants' position is that Plaintiff contributed nothing to Defendants' technological advances, (*see* Defs.' Summ J. Mem. 33 ("[Pepsi] did not misappropriate [Plaintiff's] claimed trade secrets, and instead independently developed the assertions offered in its patent applications and that [Plaintiff] now claims are its trade secrets.")). The task of determining which version to credit belongs to the trier of fact.

In sum, Plaintiff has proffered enough information to permit a reasonable jury to conclude that it possessed the claimed trade secrets at the time relevant to this Action. Plaintiff's

evidence on these factors is not overwhelming or abundant, but Defendants are not entitled to summary judgment on the ground that Plaintiff did not possess a trade secret.

## 2. Misappropriation of Plaintiff's Trade Secrets

Next, Plaintiff must demonstrate that "[D]efendants used [its] trade secret[s] in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transp.*, 559 F.3d at 117 (internal quotation marks omitted). To succeed on this element, Plaintiff must show that it communicated its trade secrets to Defendants and that Defendants misappropriated that information. *See Waterville Inv., Inc. v. Homeland Sec. Network, Inc. (NV Corp.)*, No. 08-CV-3433, 2010 WL 2695287, at *4 (E.D.N.Y. July 2, 2010) (granting summary judgment where the plaintiff presented no evidence that it disclosed a trade secret to the defendants). "[I]t is well[-]recognized with respect to trade secrets that in most cases, [the] plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him or her that it is more probable than not what [the] plaintiffs allege happened did in fact take place." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242, 2002 WL 237838, at *3 (S.D.N.Y. Feb. 19, 2002) (alterations and internal quotation marks omitted).

Plaintiff contends that Defendants' misappropriation of its trade secrets is evident in three publications: the '245, '909, and '551 Publications. Defendants dispute this claim and, in the alternative, argue that Pepsi has proven the independent development of the inventions described in those publications.

### a. The '245 Publication

The '245 Publication was published on March 4, 2010, and lists Havekotte and Covarrubias as inventors. (*See* Harper Decl. Ex. 48; Defs.' 56.1 ¶ 30; Pl.'s 56.1 Resp. ¶ 30.)

Plaintiff does not dispute that its employees never had personal interactions with Havekotte or Covarrubias, but contends that Havekotte and Covarrubias learned Plaintiff's trade secrets through Telesca, Strange, employees at Quaker and Tropicana, and attendees of the January 17, 2008 meeting in Chicago. (*See* Pl.'s Summ. J. Opp'n 30.)

The strongest evidence of misappropriation relates to the January 17, 2008 meeting, which Strange listened to over the conference line. (*See* Garner Decl. Ex. 200, at ST-002497.) Metadata also indicates that Telesca and Given possessed copies of the slideshow presented during the meeting. (*See* Pl.'s 56.1 ¶ 52.) During his deposition, Landau testified at length about the trade secret disclosures that were made during the presentation. (*See* Garner Decl. Ex. 199, at 555–63.) He specifically identified the Orange Juice, Freshness, Dosing, Polymer Entrapped or Encapsulated Flavor, and Consumer Study trade secrets as being disclosed during his presentation. (*See id.* at 557 ("I talked about the orange juice trade secret



); *id.* at 558–59 ("I talked about the freshness trade secret,

"); *id.* at 559–60 ("I've talked about the dosing trade secret

."); *id.* at 562–63

("I also talked about the encapsulated aromatic trade secret, ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮"); *id.* at 563 ("I did talk about the Consumer Study and what that means, the importance of it."). A reasonable jury could conclude that this information found its way to Havekotte and Covarrubias because Strange was a member ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮with Havekotte and Covarrubias. (*See* Garner Decl. Ex. 205.) Strange also requested and received product samples from Landau in March 2008 in connection with her work on ▮ "▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See* Garner Decl. Ex. 200, at ST-002497; Pl.'s 56.1 ¶¶ 57, 61.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (Garner Decl. Ex. 200, at ST-002497.)

A reasonable jury could further conclude that Covarrubias relied on information he received personally or from other Pepsi employees to create the invention described in the '245 Publication. In November and December 2007, Covarrubias conducted ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ (*see* Garner Decl. Ex. 195, at PEP0097797 (internal quotation marks omitted)), which indicates a lack of sophistication in the area. Then, on January 28, 2009—11 days after Landau claims he disclosed trade secrets during the presentation to Pepsi employees— Covarrubias made his first entry in his research laboratory notebook about aroma release packaging, (*see* Garner Decl. Ex. 192, at PEP0090481), a notebook he possessed since June 6, 2007, (*see id.* at PEP0090480). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



█████████████████████████████████████ The timing of
Covarrubias's notebook entry and its subject matter are circumstantial evidence that Plaintiff's disclosures played a role in the creation of the '245 Publication.

Additional evidence of misappropriation can be found by examining the degree of similarity between Plaintiff's trade secrets and the '245 publication. *See Grynberg v. BP, P.L.C.*, No. 06-CV-6494, 2011 WL 1161540, at *7 (S.D.N.Y. Mar. 30, 2011) ("[T]he law of trade secrets acknowledges the basic logic that when two products looks alike, there is probably more than a coincidental connection between them."); *see also id.* ("Logically, in any case where what is done or produced by the alleged thief bears some unique markers of the allegedly stolen secrets, it may be inferred that the thief used the secrets."). Dr. Cadwallader examined the '245 Publication and found over 30 instances in which the '245 Publication "misappropriated or disclosed" Plaintiff's claimed "trade secrets and other confidential information." (Cadwallader Supplemented Expert Report ¶ 112.) Thus, there is sufficient evidence for a reasonable jury to conclude that Plaintiff disclosed its claimed trade secrets to Defendants and that Defendants misappropriated that information.

### b. The '909 & '551 Publications

The '909 Publication was published on January 12, 2012, and lists Zhang and Given as the inventors. (*See* Harper Decl. Ex. 59, at PEP0097114; Defs.' 56.1 ¶ 35; Pl.'s 56.1 Resp. ¶ 35.) The '551 Publication was published on March 7, 2013, and also lists Given and Zhang as the inventors. (*See* Harper Decl. Ex. 62, at PEP0097122; Defs.' 56.1 ¶ 38; Pl.'s 56.1 Resp. ¶ 38.) Plaintiff contends that its trade secrets were disclosed to Given and Zhang through Telesca, Strange, Havekotte, Covarrubias, Steiger, the attendees at the January 2008 meeting in Chicago, and the attendees of the March 25, 2010 presentation. (*See* Pl.'s Summ. J. Opp'n 31, 33.)

Construing the facts in the light most favorable to Plaintiff, a reasonable jury could get a whiff that Plaintiff's trade secrets were disclosed to Given and Zhang in at least the following ways. First, there is evidence that Covarrubias transferred his knowledge of Plaintiff's trade secrets to Given in 2008. (*See* Garner Decl. Ex. 208 █████████████ ████████████████████████████████████████████████ Covarrubias's transfer of knowledge ███████████████████████████████████ to Given is significant because a reasonable jury could conclude that Covarrubias relied on Plaintiff's trade secrets in creating the '245 Publication. A fair inference that could be drawn from Covarrubias's and Given's contact is that Covarrubias shared Plaintiff's trade secrets with Given. ████████████████████████████████████████████ ██████████████████████████████ Finally, Given is listed as an attendee of the March 25, 2010 meeting, during which Landau discussed certain of Plaintiff's trade secrets. (*See* Garner Decl. Ex. 203, at 1273–74, 1277–79; Garner Decl. Ex. 227, at PEP0033211.)

The Parties have spilled a lot of ink over what occurred during the March 25, 2010 meeting. In an attempt to throw the Court off of the scent of Plaintiff's trade secret disclosures, Defendants argue that documentary evidence establishes that no trade secrets were disclosed. (*See* Defs.' Summ. J. Mem. 31.) The documentary evidence to which Defendants refer is Nicholson's contemporaneous notes. (*See id.* at 32.) There are two issues with Defendants' reliance on Nicholson's notes. First, the argument is a rehashing of their objective-evidence requirement. Assuming that Nicholson's notes reveal that no trade secrets were disclosed, the notes are directly contradicted by Landau's testimony that he disclosed trade secrets. (*See* Garner Decl. Ex. 203, at 1273–74, 1277–79.) The only conclusion that the Court can draw from this conflict is that genuine disputes of material fact abound. Second, the Court cannot assume

Nicholson's notes reveal that trade secrets were not disclosed because Plaintiff contends that the notes contain reference to elements of the Freshness, Sweet Aroma, Polymer Entrapped or Encapsulated Flavor, Orange Juice, Protective Coating, Secondary Cover, Consumer Study, Labeling, and Modify No Masking trade secrets. (*See* Pl.'s Summ. J. Opp'n 33.) Thus, a reasonable jury could conclude that Given, and Zhang through association with Given, were exposed to Plaintiff's trade secrets prior to the creation of the '909 and '551 Publications.

Evidence of Defendants' misappropriation of the information shared through these channels also is circumstantially shown by Dr. Cadwallader's examination of the '909 and '551 Publications. While these publications do not expressly disclose any of Plaintiff's trade secrets, (*see* Cadwallader Supplemented Expert Report ¶¶ 113–14), Dr. Cadwallader identified several instances where Plaintiff's trade secrets may be embodied in them, (*see id.*). The timing of the discovery of the inventions described in the '909 and '551 Publications also circumstantially indicates that Plaintiff's trade secrets played a role in Defendants' research and development efforts. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ A reasonable jury could conclude that Zhang learned Plaintiff's trade secrets during his interactions with these employees.[8]

---

[8] As proof that Plaintiff did not disclose trade secrets to Defendants, Defendants offer the testimony of certain non-party witnesses who testified that Plaintiff did not disclose trade secrets

Again, while Plaintiff's evidence on disclosure and misappropriation is not abundant or overwhelming, and the finder of fact will have to draw several inferences in Plaintiff's favor based solely on circumstantial evidence, the evidence is sufficient to thwart Defendants' Summary Judgment Motion.

### c. Pepsi's Independent Development Defense

"It is a well-recognized principle that, where a defendant in a trade secret case claims independent development, the burden shifts to the defendant to show that this was in fact the case." *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 732 F. Supp. 370, 377–78 (S.D.N.Y. 1989), *aff'd*, 920 F.2d 171 (2d Cir. 1990). Defendants have documentary proof that they were independently researching and working to develop aroma release packaging, (*see* Defs.' Summ. J. Mem. 34), and Dr. Hotchkiss reviewed this work product and determined that the inventions described in the '245, '909, and '551 Publications were independently developed by Pepsi. (*See* Hotchkiss Report ¶ 68 ("Based on my experience, knowledge of the industry, analysis of the documents produced by Defendants, analysis of publicly available information, and consideration of the factual record in this case, Defendants independently developed the technology that was allegedly misappropriated."); *see also id.* ¶¶ 69–87.) Plaintiff has not offered any expert testimony to rebut Dr. Hotchkiss's opinion on this matter. Indeed, Dr. Cadwallader conceded that it was possible that Pepsi independently developed all of the technology described in the three patent applications. (*See* Harper Decl. Ex. 132, at 308–09.) However, the Court cannot grant Defendants' summary judgment on this ground because Defendants' interpretation of the record is only one plausible interpretation. As discussed above,

---

to them. (*See* Defs.' Summ. J. Mem. 32.) This testimony is not conclusive as to whether Plaintiff disclosed trade secrets to Defendants.

construing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in its favor, another reasonable interpretation of the record is that Plaintiff's trade secret disclosures led to the development of Pepsi's technology. The finder of fact will determine which version to credit.

### 3. Damages

Plaintiff claims that it was damaged by Defendants' misappropriation because it lost business with Coke. *See LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 185 (S.D.N.Y. 2002) (noting that loses "may be measured according to any loses [the] plaintiff suffered from the alleged misappropriation," including "the revenue [the] plaintiff would have made but for the defendant's wrongful conduct"). "Future lost profits . . . may be awarded based upon known reliable factors without undue speculation." *Suburban Graphics Supply Corp. v. Nagle*, 774 N.Y.S.2d 160, 163 (App. Div. 2004) (internal quotation marks omitted).

Defendants argue that they are entitled to summary judgment on Plaintiff's trade secret misappropriation claim because Plaintiff's alleged damages are highly speculative. (*See* Defs.' Summ. J. Mem. 36.) Specifically, Defendants note that the Coke projects forming the basis of Plaintiff's damages claims were in the preliminary stages and problem-ridden. (*See id.*) The documents and testimony produced during discovery reveal that Defendants' arguments are not unfounded—Project ███ never moved past Phase 1, (*see* Harper Decl. Ex. 92, at ST-042338), Plaintiff had difficulty developing the product, (*see* Harper Decl. Ex. 91, at ST-026753; Harper Decl. Ex. 93, at ST-026591; Defs.' 56.1 ¶¶ 71, 73; Pl.'s 56.1 Resp. ¶¶ 71, 73), and ███ testified that commercialization "was still very far out," (Harper Decl. Ex. 96, at 153). However, Plaintiff has a response to each of these contentions—Phase 1 was successfully completed and the project was put on hold because Coke discovered Pepsi's '245 Publication. (*See* Garner

Decl. Ex. 258, at 118; Garner Decl. Ex. 264, at ST-009981; Garner Decl. Ex. 270, at ST-012955.) In other words, but for the '245 Publication Project ███ would have proceeded to commercialization. At the time the project was cancelled, ███ estimated Project ███ had a 35% chance of producing a product that could be commercialized. (*See* Harper Decl. Ex. 96, at 196.) Dr. Sand explained that ███ 35% estimate reflects a high likelihood of success within the food and beverage industry. (*See* Garner Letter Ex. C ("Sand Expert Report") ¶ 132.) Based on her experience in the industry, Dr. Sand opined that Project ███ "more likely than not would have been successful but for Pepsi's disclosure of [Plaintiff's] trade secrets in Pepsi's '245 Publication." (*Id.* ¶ 129.) In turn, Hoeberlein—Plaintiff's damages expert—states that Project ███ would have generated approximately ███ in total profits for Plaintiff. (*See* Garner Decl. Ex. 278 ("Hoeberlein Expert Report") ¶ 13.) Thus, construing the facts in the light most favorable to Plaintiff, Plaintiff has proffered enough facts, disputed though they may be, upon which a reasonable jury could conclude that it suffered damages as a result of Defendants' misappropriation.[9]

---

[9] The Court notes that this conclusion is limited only to the fact that Plaintiff has sufficiently established *some* quantum of damages. One could seriously question whether Plaintiff can ultimately recover even a fraction of its claimed damages. Hoeberlein estimates that Plaintiff would have generated profits totaling approximately ███ from Project ███ utilization outside of the United States on brands such a ███ (*See* Hoeberlein Expert Report Ex. 1.) There is very little record evidence to support this claim—it consists of two emails. The first is an email from Landau to people who are not Coke employees, that notes "Coke will want to roll [Project ███ out to other brands," with ███ being identified as "[s]econd on the list." (Garner Decl. Ex. 254, at ST-011523.) The second is an email from Landau to Edelstein, in which Landau states that ███ said Project ███ is "likely" to "go global." (Garner Decl. Ex. 262, at ST-036045.) It take a large leap to get from this evidence to ███ in damages, given the preliminary stage of Project ███ and the serious concerns Coke had with Plaintiff's ability to actually deliver a commercially viable product. In any event, Plaintiff's claim survives to another day.

While Plaintiff's damages in connection with Project ███ are not too speculative, Plaintiff's damages as they relate to the ███ project are. Beginning in 2010, Plaintiff had preliminary discussions with ███████ about ████████████████████. (*See* Defs.' 56.1 ¶ 93; Pl.'s 56.1 Resp. ¶ 93.) As of July 2011, ████ said that Coke/████ remained interested in pursuing the project, but wanted first to see Project ████ outcome. (*See* Garner Decl. Ex. 276, at ST-036011.) In January 2012, Plaintiff emailed ████ about moving the project forward. (*See* Garner Decl. Ex. 277, at ST-003575.) In the email, Landau admitted that at the time Plaintiff and ████████ began their discussions, Plaintiff "did not have a commercially ready ████████ (*Id.*) Eventually ████████ ceased communicating with Plaintiff, but only after ████████ asked about the "IP of the ████ ████ (*Id.* at ST-003574.) Undeterred by the preliminary nature of these communications, Hoeberlein estimates that the ████████ project would have resulted in approximately ████ ████ in profits, (*see* Hoeberlein Expert Report ¶ 13), based in part upon worldwide distribution of ████/Coke's products, (*see id.* ¶ 166).

There is simply no factual basis in the record to support Hoeberlein's calculations. Plaintiff's communications with ████████ reveal nothing more than an unrequited sales pitch. Significantly, unlike with Project ████ no one has offered any opinion as to the likelihood of this project being commercialized. Indeed, Dr. Sand merely opines that had Project ████ been successful, Plaintiff "would have also had *an opportunity* to commercialize its technology for use in ████████████████" (Sand Expert Report ¶ 159 (emphasis added).) Nor was there even any discussion of the price Plaintiff would charge ████████ for the ████████, meaning that Hoeberlein's estimation of Plaintiff's profits rests upon pure speculation. Thus, on this point Hoeberlein's report is "undu[ly] speculati[ve]," *Suburban Graphics*, 774 N.Y.S.2d at

163 (internal quotation marks omitted); *see also Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07-CV-376, 2008 WL 2275902, at *8 (S.D.N.Y. June 3, 2008) (dismissing lost profits claims because there was "no basis for the court to determine lost profits"), and Plaintiff cannot rely upon it to thwart summary judgment, *see R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 253 (S.D.N.Y. 2010) ("Expert testimony that is merely subjective belief or unsupported speculation should be excluded." (internal quotation marks omitted)); *Noveck v. PV Holdings Corp.*, 742 F. Supp. 2d 284, 302 (E.D.N.Y. 2010) ("[W]here an expert's affidavit is vague, conclusory and factually unsupported, it fails to raise an issue of fact." (internal quotation marks omitted)); *cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects."). As there is no evidence that Plaintiff suffered damages relating to the ██████ project, Defendants are entitled to summary judgment on this portion of Plaintiff's misappropriation claim.

### C. Breach of Contract

Plaintiff asserts four breach of contract claims relating to the four confidentiality agreements Plaintiff executed with Defendants. Defendants contend that Plaintiff's breach of contract and misappropriation claims rise and fall together. (*See* Defs.' Summ. J. Mem. 37.) Of course, in making this argument Defendants assumed (or hoped) the Court would grant them summary judgment on Plaintiff's misappropriation claim. The Court, however, has determined that Defendants are not entitled to summary judgment on Plaintiff's misappropriation claim. As Plaintiff's breach of contract claims rise or fall with the misappropriation claim, Defendants are not entitled to summary judgment on these claims either.

<u>D. Common Law Claims</u>

Plaintiff asserts three common law claims—unfair competition, unjust enrichment, and constructive trust. Much of Defendants' argument with respect to these claims is premised on their assumption that the Court will grant summary judgment on the misappropriation claim. (*See* Defs.' Summ. J. Mem. 39.) As the Court has not entered summary judgment on that claim, this argument lacks merit. Beyond this argument, Defendants principally attack Plaintiff's common law claims on the ground that they are duplicative of Plaintiff's breach of contract claim and that Defendants owed no independent legal duty to Plaintiff. (*See* Defs.' Summ. J. Mem. 38 n.18, 39 n.19; Defs.' Reply Mem. in Supp. of Mot. for Summ. J. 17–18 (Dkt. No. 128).)

The existence of valid contracts—the confidentiality agreements—precludes Plaintiff from asserting separate causes of action for unfair competition, unjust enrichment, and constructive trust. Indeed, courts have found that these claims are duplicative of a breach of contract claim and dismissed them on that basis. *See RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14-CV-6294, 2015 WL 5008762, at *5–6 (S.D.N.Y. Aug. 24, 2015) (dismissing unfair competition claim as duplicative of breach of contract claim because "[i]t is well-settled . . . that no claim for unfair competition lies where its underlying allegations are merely a restatement, albeit in slightly different language, of the implied contractual obligations asserted in the cause of action for breach of contract" (alteration and internal quotation marks omitted); *Cereus Prod. Dev., Inc. v. Boom LLC*, No. 14-CV-4292, 2015 WL 3540827, at *8 (S.D.N.Y. June 5, 2015) ("[I]t is one of the well-settled principles of New York law that the existence of a valid and enforceable contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." (internal quotation

marks omitted)); *id.* at *9 ("Where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists, and a constructive trust should not be imposed." (alteration and internal quotation marks omitted)). A plaintiff may maintain tort claims in addition to a breach of contract claim only where "a legal duty independent of the contract itself has been violated." *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). Plaintiff has demonstrated nothing more than a business relationship between the Parties and thus Defendants are entitled to summary judgment on these claims. *See Legend Autorama, Ltd. v. Audi of Am., Inc.*, 954 N.Y.S.2d 141, 144 (App. Div. 2012) ("A conventional business relationship, without more, is insufficient to create a fiduciary relationship. Rather, a plaintiff must show special circumstances that transformed the parties' business relationship to a fiduciary one.").

### E. Correction of Inventorship

With respect to the '637 Patent, Plaintiff seeks a correction of inventorship "because Landau is at least a joint inventor of the claimed subject matter." (Pl.'s Summ. J. Opp'n 40.)[10] The inventors listed in a patent issued by the United States Patent and Trademark Office are presumed to be correct. *See Finkelstein v. Mardkha*, 495 F. Supp. 2d 329, 337 (S.D.N.Y. 2007). Therefore, "the burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence." *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997) (alteration and internal quotation marks omitted).

"Inventorship is a question of law that relies on underlying findings of fact, which are reviewed by appellate courts for clear error." *Leighton Techs. LLC v. Oberthur Card Sys., S.A.*,

---

[10] Plaintiff does not seek this relief with respect to any of Pepsi's other publications because Pepsi has abandoned its other filings. (*See* Pl.'s Summ. J. Mem. 40.)

531 F. Supp. 2d 591, 595 (S.D.N.Y. 2008); *see also Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1329 (Fed. Cir. 2014) (same). Alleged co-inventors "must prove their contribution to the conception of the invention with more than their own testimony concerning the relevant facts." *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1382 (Fed. Cir. 2004). Corroborating evidence may include "records made contemporaneously with the inventive process," "[c]ircumstantial evidence of an independent nature," or "oral testimony from someone other than the alleged inventor." *Id.* "A district court should not grant summary judgment on inventorship where there are genuine issues of material fact." *Leighton Techs.*, 531 F. Supp. 2d at 595.

The record is certainly light on corroborating evidence, but there are genuine issues of material fact as to whether Landau created the technology described in the '637 Patent. Accordingly, summary judgment is improper on this claim.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion To Strike is denied without prejudice and its Motion for Summary Judgment is granted in part and denied in part. The Motion for Summary Judgment is denied as to Plaintiff's misappropriation, breach of contract, and correction of inventorship claims, but granted as to the remaining claims. The Court will hold a status conference on October 19, 2017, at 11:30am. The Clerk of Court is respectfully directed to terminate the pending Motions. (Dkt. Nos. 108, 120.)

This Opinion will be filed under seal. The Parties have 14 days to provide the Court with a proposed redacted copy for public filing.

SO ORDERED.

Dated: September 14, 2017
      White Plains, New York

KENNETH M. KARAS
United States District Judge