UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

SCENTSATIONAL TECHNOLOGIES, LLC,

                           Plaintiff,

                -v-

PEPSI, INC., PEPSI-COLA TECHNICAL
OPERATIONS, INC., THE QUAKER OATS
COMPANY, STOKELY-VAN CAMP, INC.,
TROPICANA PRODUCTS, INC.,

                         Defendants.

------------------------------------------------------------ X

13-cv-8645 (KBF)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 14, 2018

KATHERINE B. FORREST, District Judge:

On December 5, 2013, plaintiff Scentsational Technologies, LLC ("ST") filed this action against defendants Pepsi, Inc., Pepsi-Cola Technical Operations, Inc., The Quaker Oats Company, Stokely-Van Camp, Inc., and Tropicana Products, Inc. ("Pepsi") alleging misappropriation of trade secrets (Count I); breach of contract (Counts II-V); unfair competition (Count VI); unjust enrichment (Count VII); constructive trusts (Count VIII); and correction of inventorship (Count IX). (ECF No. 1, Compl.) On July 1, 2014 and in response to Pepsi's motion to dismiss, ST filed an amended complaint with the same claims. (ECF No. 33, Am. Compl.) On January 24, 2017, Pepsi moved for summary judgment, (ECF No. 108), and to strike certain documents, (ECF No. 120). On October 2, 2017, Judge Karas issued an opinion[1] denying the motion to strike and granting summary judgment to

---

[1] The opinion had been released to the parties earlier to give them an opportunity to redact text prior to its public release.

defendants on: (1) plaintiff's damages claim for trademark appropriation as to Project Fanta, (ECF No. 136, Opinion & Order at 42); and (2) plaintiff's common law claims, (id. at 45).  All other claims remain live.

On September 28, 2018, this case was transferred to the undersigned.  Trial in this matter is set to commence on April 16, 2018.  Currently pending before the Court are defendants' three motions to preclude reports and testimony of plaintiff's proposed experts under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993): (1) Dr. Claire Sand (ECF No. 151); (2) Wayne A. Hoeberlein (ECF No. 152); and (3) Keith R. Cadwallader (ECF No. 153).[2]  For the reasons set forth below, the motion as to Dr. Sand is GRANTED in part and DENIED in part, and as to Mr. Hoeberlein is GRANTED.[3]

I.    LEGAL PRINCIPLES

Pepsi's motions are based upon arguments that the proffered experts are offering inappropriate opinions regarding the law, opinions as to conclusions of ultimate fact issues, or are otherwise based on non-existent or unreliable methodology.  Pepsi's "reliability" arguments (as to Sand) imply an assertion that Sand lacks requisite qualifications.  The motions are analyzed pursuant to Rule 702, Daubert, and related case law.

"Expert testimony may help a jury understand unfamiliar terms and concepts."  United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).  However, a trial court is obligated to act as a gatekeeper with respect to expert testimony.

---

[2] The Court notes that ECF Nos. 151 and 152 are corrected versions of ECF Nos. 149 and 150, respectively.  The Court will refer to the corrected versions, although this Opinion closes the open motions at ECF Nos. 149–52.

[3] The Court does not decide the motion as to Mr. Cadwallader at this time.

Daubert, 509 U.S. 579, 597 (1993); see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) ("Under Daubert, the district court functions as the gatekeeper for expert testimony, whether proffered at trial or in connection with a motion for summary judgment." (internal quotations omitted)). "The primary locus of [that] obligation is [Federal Rule of Evidence] 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." Daubert, 509 U.S. at 589.

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. All experts must meet the basic requirements of Rule 702. This Court's inquiry into whether those requirements are met includes a review of (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact. See, e.g., Nimely v. City of New York, 414 F.3d 381, 396–97 (2d Cir. 2005); Arista Records LLC v. Lime Group LLC, No. 06-cv-5936, 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011) (quoting Fed. R. Evid. 702). The party seeking to introduce and rely on expert testimony bears the

burden of establishing that the proposed expert and his or her testimony meets the requirements of Rule 702 by a preponderance of the evidence. <u>Daubert</u>, 509 U.S. at 593 & n.10.

A. <u>Qualifications</u>

Inquiry into a proposed expert's qualifications is a threshold question that seeks to determine whether the proposed expert is, in fact, an expert at all in the area in which he or she intends to testify. <u>See</u> <u>Daubert</u>, 509 U.S. at 593 n.10; <u>Arista Records</u>, 2011 WL 1674796, at *2. Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to express. <u>See Arista Records</u>, 2011 WL 1674796 at *2: <u>see also</u> <u>Morse/Diesel, Inc. v. Trinity Indus., Inc.</u>, 67 F.3d 435, 444 (2d Cir. 1995) (affirming the district court's preclusion of an expert witness from "rendering opinions on subjects outside his field of expertise").

In the Second Circuit, courts have construed the inquiry into an expert's qualifications with an eye towards the "liberal thrust" of the Federal Rules and their general relaxation of traditional barriers to opinion testimony. <u>See In re Rezulin Prods. Liab. Litig.</u>, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has the equivalent relevant practical experience."); <u>see also</u> <u>Daubert</u>, 509 U.S. at 588–89. If an expert's training and

4

experience are in a field closely related to the area to the proposed testimony, that may—in appropriate circumstances—be sufficient to meet Rule 702's qualification standards.  See Arista Records, 2011 WL 1674796, at *3; Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04-cv-7369, 2006 WL 2128785, at *6 (S.D.N.Y. July 28, 2006).

B.  Reliability

The reliability of a proposed expert's testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at 592-93.  Among the questions to be answered are whether the theory or methodology can be tested, whether it has been subjected to peer review, whether it has a potential rate of error, and whether it is a "generally accepted" methodology or theory.  Id. at 593–94.

There are, however, limitations that a court can, and indeed sometimes must, place upon even a qualified expert proposing to testify as to some admissible opinions.  For instance, the court may preclude an expert from testifying as to the credibility of other witnesses or evidence.  See United States v. Scop, 846 F.2d 135, 142, modified by 856 F.2d 5 (2d Cir. 1988); In re Blech Secs. Litig., No. 94-cv-7696, 2003 WL 1610775, at *21–22 (S.D.N.Y. Mar. 26, 2003) (noting that "the fact that the expert witness had read someone else's deposition would not give him personal

knowledge of the underlying facts" (internal quotation omitted)); <u>Linkco, Inc. v.</u>
<u>Fujitsu Ltd.</u>, No. 00-cv-7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002).

Furthermore, an opinion that is speculative or conjectural does not satisfy
Rule 702.  <u>See</u> <u>Daubert</u>, 509 U.S. at 590 ("'[K]nowledge' connotes more than
subjective belief or unsupported speculation."). Thus, "proffered expert testimony
should be excluded if it is speculative or conjectural"; in fact, "admission of expert
testimony based on speculative assumptions is an abuse of discretion." <u>Major</u>
<u>League Baseball Props.</u>, 542 F.3d at 311 (internal quotations and alterations
omitted). While the <u>Daubert</u> inquiry is "flexible," it is intended to "ensure that the
courtroom door remains closed to junk science"; as such, to warrant admissibility,
"it is critical that an expert's analysis be reliable at every step." <u>Amorgianos v.</u>
<u>Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002).

Similarly, conclusory opinions—often referred to as <u>ipse dixit</u>—fail to provide
a methodology that would allow a court to assess reliability.  <u>See</u> <u>Major League</u>
<u>Baseball</u>, 542 F.3d at 311 (internal citation omitted); <u>Bridgeway Corp. v. Citibank</u>,
201 F.3d 134, 142 (2d Cir. 2000) (internal citation omitted).  <u>Ipse dixit</u> opinions are
therefore excludable on that basis.  <u>See, e.g.</u>, <u>Nimely</u>, 414 F.3d at 396-97.  It should
be noted that there are instances in which qualified experts proffer only <u>ipse dixit</u>—
when in fact it appears that they had the ability to support their opinions.

However, the disclosure obligations set forth in Rule 26 do not provide for a "do over"—in most cases, what is done is done.

C. Usurping the Role of the Court or the Trier of Fact

Expert testimony must be helpful to—but not usurp the province of—the court and/or trier of fact. Bilzerian, 926 F.2d at 1294. In the first instance, Federal Rules of Evidence 401, 402, and 403 govern the inquiry of whether an individual qualified as an expert, using reliable methodologies, is proffering testimony that is both admissible and should be allowed. Rule 403, which provides for the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," is applicable to the Court's inquiry in this regard. Daubert, 509 U.S. at 595 (quoting Fed. R. Evid. 403).

In addition, expert testimony may not usurp the province of the judge to instruct on the law, or of the jury to make factual determinations. See Bilzerian, 926 F.2d at 1294. While an expert "may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." Id.; see also In re Blech Secs. Litig., 2003 WL 1610775, at *22. Moreover, "[a]lthough testimony concerning the ordinary practices in [an] industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admiss[i]ble, and may not be made

so simply because it is presented in terms of industry practice." Bilzerian, 926 F.2d at 1294.

D. Inappropriateness of Factual Narratives

Most typically, and certainly here, experts are not percipient witnesses. They are witnesses who, by virtue of specialized expertise, are able to provide opinions or information beyond the ken of the layperson. It is therefore inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's "story." See Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008) (precluding an expert from providing a factual narrative); In re Rezulin Prods. Liability Litig., 309 F. Supp. at 551 (precluding an expert from providing a "narrative of the case which a juror is equally capable of constructing"). It is certainly the case that an expert may and often must rely on facts—and that the expert will state them in a report. But if the statements go beyond recitation of how a document is supportive of an opinion and are instead a characterization of the document for the purposes of having the fact finder accept that interpretation as fact, the expert goes too far.

Acting simply as a narrator of the facts does not convey opinions that are based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Similarly, experts may not "opine on a party's state of mind." Highland Capital Mgmt., 551 F. Supp. 2d at 187; see also In re Rezulin Prods. Liability Litig., 309 F. Supp. at 547 ("Inferences about the intent or motive of

parties or others lie outside the bounds of expert testimony."). In short, mere narration fails to fulfill Daubert's most basic requirements. See In re Rezulin Prods. Liability Litig., 309 F. Supp. at 551. In addition, narration of facts of the case may easily invade the province of the jury, providing a separate basis for exclusion. See id.

E. Timeliness

"[E]xperts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions." Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., 769 F. Supp. 2d 269, 278 (S.D.N.Y. 2011) (quoting Sandata Technologies, Inc. v. Infocrossing, Inc., Nos. 05-cv-9546, 06-cv-1896, 2007 WL 4157163, at *6 (S.D.N.Y. Nov. 16, 2007)). "If an expert's report 'does not rely [on] any information that was previously unknown or unavailable to [her],' it is not an appropriate supplemental report under Rule 26." Id. (quoting Lidle v. Cirrus Design Corp., No. 08-cv-1253, 2009 WL 4907201, at *5–6 (S.D.N.Y. Dec. 18, 2009).

"However, 'preclusion of an expert report can be a harsh sanction.'" Id. (quoting Sandata Technologies, Inc., 2007 WL 4157163, at *7). "In determining whether preclusion is appropriate, courts must consider: (1) the reasons for the delay in providing the evidence; (2) the importance of the evidence precluded; (3) the prejudice to the opposing party from having to address the new evidence; and (4) the possibility of a continuance. Id. (citing Softel, Inc. v. Dragon Medical and

<u>Scientific Communications, Inc.</u>, 118 F.3d 955, 961 (2d Cir.1997); <u>Outley v. City of New York</u>, 837 F.2d 587, 590–91 (2d Cir. 1988)).

## II.   BACKGROUND

ST alleges that it owns a number of trade secrets related to the development and commercialization of scented packaging.[4]  Between 2001 and 2010, ST and Pepsi negotiated the potential purchase of ST's technology by Pepsi.  During this time—and specifically in December 2003, July 2005, and February 2010—the parties entered into three confidentiality agreements governing the disclosure of confidential information.  Ultimately, the parties never reached a business deal.

According to Pepsi, at the same time it was discussing aroma release technology with ST, it was actively engaged on a parallel track of in-house development.  Between 2008 and 2013, Pepsi filed three patent applications for aroma release technology.  The first application (the "'245 Application") was published on March 4, 2010; the second application (the "'909 Application") was published on January 12, 2012 and the patent issued on July 2, 2013 (the "'637 Patent"); and the third application (the "'551 Application") was published on March 7, 2013.  The inventions reflected in Pepsi's patent applications never resulted in a commercialized Pepsi product.[5]  There is no claim in this case that Pepsi has itself

---

[4] While the number of alleged trade secrets that were disclosed has varied while this action has been pending, ST is prosecuting the disclosure of eleven alleged trade secrets at this time.
[5] The parties disagree on the reason for this failure.  Pepsi claims that it was not commercialized because of the cost and lack of consumer demand; ST claims that the failure is due to Pepsi's inability to develop a feasible delivery system.

commercialized ST's aroma release technology.  Instead ST's claims are based on a failed relationship with Coca-Cola ("Coke").

Starting in 2010, ST met with Coke to explore a business relationship.  In August 2010, they executed an agreement for a project entitled "Project Activo," which focused on incorporating ST's aroma release technology into Coke's Minute Maid orange juice containers.[6]  After exploring three ways in which ST's technology could be used in Coke's products, ST and Coke settled on a microencapsulation spray on Minute Maid enclosures and liners.  Two phases of the project were outlined.  Phase 1 was a research phase in which Coke and ST were to evaluate whether the aroma would translate well with ST's technology and whether the product would maintain stability in the presence of water as well as Coke's juices. If Phase 1 succeeded, the team would decide whether to move into Phase 2 and commercialize the product.  However, that project was eventually put on hold and ultimately terminated; the parties disagree as to whether the project ever progressed to Phase 2.  In his deposition, Carlton Gibbs, a former senior engineer and senior project manager at Coke's Global Packaging and North American Packaging groups, testified that at the time of its termination, Project Activo had only a 35% chance of ever being commercialized.

The remaining dispute in this case relates to the abandonment of Project Activo.  ST claims that the project was abandoned because Coke was dissuaded by

---

[6] Judge Karas granted summary judgment in favor of defendants with regard to plaintiff's claims concerning a separate project—"Project Fanta."  Accoridngly, the Court disregards the experts' opinions concerning that project.

Pepsi's patent applications for similar technology; ST further asserts that Pepsi misappropriated ST's trade secrets in seeking those patents. Pepsi, however, claims that Project Activo failed because Coke unilaterally decided not to further pursue developing or commercializing ST's technology. The damages sought by ST, amounting to at least $73 million, relate to ST's alleged lost profits from the failed Project Activo.

ST has proffered the testimony of three expert witnesses in support of its claims. In this Opinion, the Court addresses Pepsi's mtions to preclude two of those experts.

## III. DR. CLAIRE SAND

Sand's expert opinion covers a range of subjects, only some of which are within her area of expertise. She discusses the trade secret status of ST's technology, ST's relationship with both Pepsi and Coke, and the likelihood that a project between ST and Coke would have succeeded, if not for Pepsi's patent applications. Defendant has moved to preclude the entirety of her report/opinions. As set forth below, the Court finds that there is a relatively narrow area of expertise on which Sand has the requisite experience—microencapsulation in aroma packaging. If Sand has offered opinions and supported them (even in depositions) on that topic, she may offer those at trial. (She may not add new opinions.)

### A. Background

Sand is the founder of Packaging Technology and Research and an Adjunct Professor at Michigan State University's School of Packaging, where she teaches

courses in Packaging Materials. (Def. Ex. 1, Sand Decl. ¶¶ 5, 8.) She received her B.S. in Packaging from Michigan State University in 1986; a M.S. in Packaging from Michigan State University in 1989; and a Ph.D. in Food Science and Nutrition from the University of Minnesota in 1992. (Id. ¶ 6.) She has designed and refined packaging components of new and existing food products and consults on international food and packaging development products. (Id. ¶¶ 5,7.)

Sand's resume and report demonstrate expertise in the areas of practical and theoretical experience with FDA regulations relating specifically to food additives and packaging, as well as expertise in material science dynamics, encapsulation technologies, and olfaction. (Id. ¶¶ 10–13.) Her Ph.D. dissertation focused on diffusion within and migration from food and through edible films, (id. ¶ 10), and she has worked on food products with varying degrees of encapsulated aromas and flavors, (id. ¶ 11). At Kraft Sweet Brands, she used sensory analysis and shelf life testing to identify proper flavorants and amounts. (Id. ¶ 12.) Several of the classes she teaches cover the history of consumer packaging, formation technologies, the science of preservation, and consumer and market needs.[7] (Id. ¶ 13.)

However, Sand has no demonstrated expertise in a number of the areas in which she offers opinions. Nothing in her resume or report supports a particular

---

[7] Sand's expertise in packaging technology is tfurther demonstrated by her publications. She has published over twenty articles, books, and book chapters on food packaging, and she is a contributing editor and packaging columnist for Food Technology, a trade publication. (Id. ¶¶ 14–15.) She has also been a reviewer for the Journal of Food Science since 2014 and on the Editorial Board of Packaging Technology and Science since 2004. (Id. ¶ 16.) She serves on the Higher Education Review Board for the Institute of Food Technologists (IFT), as the Chair-Elect and former Chair of the IFT Food Packaging Division, and as a member of the Strategic Food Relations committee of Phi Tau Sigma, the food science honorary society. (Id. ¶ 17.)

level of expertise in legal determinations as to trade secret status (and, of course, even if she were, expert witnesses should generally not offer legal conclusions), and she does not have demonstrated expertise in large-scale product commercialization in the United States or any foreign country. Nor does Sand appear to have expertise in various components that undergird all aspects of what is broadly encompassed within the concept of successful commercialization, including overall marketing budgets, advertising budgets, advertising campaigns, advertising reach, consumer preferences, product pricing, time-to-scale new product launches, foreign regulatory schemes that might impact a foreign launch, or any cultural issues that could impact product acceptance in a foreign jurisdiction. While Sand does point to one project she worked on for Kraft Foods as "direct experience commercializing a new liner," (Sand Decl. ¶ 133), she notes that the project did not succeed; in any case, experience on one project—a liner—certainly does not qualify her as an expert witness in the area of commercialization. There is no evidence in the record that Sand has expertise or experience in all aspects of successful commercialization of an aroma liner for a consumer beverage.

B. Discussion[8]

Sand was retained by ST to analyze four issues: (1) the existence of ST's trade secrets; (2) regulatory requirements relating to ST's trade secrets; (3) ST's relationship with Pepsi; and (4) ST's business opportunities with Coke. (Id. ¶ 3.)

---

[8] The categories discussed herein reference the next subsection, which lists and explains seven topics covered by Sand.

While several of her opinions are admissible, the crux of her declaration—her opinion that Project Activo would be successfully commercialized, both domestically and abroad—is outside her areas of expertise. In addition, much of her declaration offers improper factual narrative and legal conclusions.

The heart of Pepsi's motion as to Sand is two-fold. First, Pepsi argues that Sand's opinions relating to commercialization of Project Activo are infirm and should be precluded. The Court agrees. The second aspect of Pepsi's argument relates to the rest of Sand's testimony, which Pepsi groups together as related to the existence and misappropriation of trade secrets. While Pepsi is correct that Sand's legal conclusions and factual narrative must be excluded, certain of her opinions on food and beverage packaging (as described below or that are similar to those described below)—on which she is an expert—are admissible.

   1. <u>Commercialization</u>

Sand's opinions as to the likelihood of Project Activo's success (Category 4) are inadmissible. She presents no methodology or analysis to support her assertion that Project Activo was "more likely than not" to be successful. (<u>See</u> <u>id.</u> ¶ 129.) This opinion is based on deposition testimony that Project Activo had a 35% chance of success and her assertion that a 35% likelihood of success is "high within the food industry." (<u>Id.</u> ¶ 132.) It is presented without any apparent methodology whatsoever. And while "35%" is potentially a high likelihood of success, that is necessarily a <u>relative</u> concept and is in comparison to other projects in the industry. The nature of "success" in this regard is not explained and does not <u>ipso facto</u>

equate to successful commercialization. In fact, the Coke employee who offered the number equated 35% with a "very low" likelihood of success. (Gibbs Dep. at 166-176.)

Unsurprisingly, ST's opposition brief retreats somewhat from Gibbs's testimony, in recognition of the fact that typically, the preponderance of the evidence standard requires ~51% or more (and not the "35%" statement). (Mem. Opp. At 8.) This undermines Sand even further as it eliminates even the weak reed on which her testimony relied.

Sand offers timelines by which commercialization allegedly would have occurred; but there is again no methodology set forth. The timelines are <u>ipse dixit</u>, pure speculation, or both. She also presents no methodology underlying her related assertions that "Coke could conservatively begin its staged launch of Minute Maid into one US market by October 2012," or that a worldwide launch for 100% of the market would be viable by October 2015. (<u>Id.</u> ¶ 146.) Her assertions are neither supported by data or analysis nor clearly connected to underlying facts. <u>See</u> <u>Nimely</u>, 414 F.3d at 396 ("[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the <u>ipse dixit</u> of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (quoting <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 (1997))). Here, the analytical gap between known facts and Sand's assertions is enormous. Her statements are simply <u>ipse dixit</u>.

Sand herself also undermines her conclusions as to Project Activo's success. For example, she states that "[s]avings relating to modifying production are more complex [than determining savings in post package waste] in that <u>Coke's production schedules are unknown</u>." (Sand Dec. ¶ 140 (emphasis added).) She also states that while ST has developed the orange flavor for Minute Maid, it still needed to develop the flavors for the other Minute Maid products. (<u>Id.</u> ¶ 145.) These assertions undermine not only her certainty regarding Project Activo's timeline but also the claim that commercialization was likely at all. Implementation of Phase 2 purportedly relied on whether the aroma would translate well with ST's technology and whether the product would maintain stability in the presence of water as well as Coke's juices. Sand's admission as to the uncertainty regarding flavor development and production schedules undercuts any assertion she makes as to likely success.

Relatedly, Sand's claim that ST's technology would be retained by Coke for close to seven years, (Sand Decl. ¶ 153), appears to be based on her experience with zipper reseal packaging; she provides no reason to believe aroma packaging and zipper reseal packaging are similar or have similar periods of usage. It is unclear why the zipper reseal innovation is relevant, unless for the purpose of demonstrating that "expansion in innovation [is] hard to predict." But if that is the case, (that is to say, if zipper reseal is relevant as an example of another packaging innovation whose success was unpredictable), then the only supported assertion

17

Sand can make is that the success of ST's technology is hard to predict—not that ST's technology will have the same level of success.

Sand also asserts that but for Pepsi's patent application, Project Activo had a high likelihood of success. This is similarly ipse dixit. Sand acknowledges that a number of reasons existed for the project's cancellation but claims that the "overriding reason" was Pepsi's patent application. (Sand Decl. ¶ 155.) She offers no detail to support this assumption; it appears to be mere guesswork. The Court cannot simply "take the expert's words for it" without evidence or a clear explanation. Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

In summary, Sand provides no evidence or methodology to support her assertions that Project Activo was likely to succeed and would have but for Pepsi's patent application. The Court precludes any and all testimony to this effect.

2. Other Opinions

While Pepsi's motion groups together the remainder of Sand's opinions, the Court finds that they must be parsed more finely. First, Sand's opinions as to aroma integration in packaging (Category 1) are generally admissible.[9] These opinions fall squarely within Sand's area of expertise.

However, the remainder of Sand's opinions are inadmissible. Sand improperly opines as to whether ST's technology is properly a trade secret under the

_____

[9] However, paragraph 112 is precluded, as the only evidence for Sand's assertion that "there would not have been any regulatory concerns with commercialization of the Coke product" is her "understand[ing] that [ST] always used food grade ingredients, and made this a specification for the project." (Sand Decl. ¶ 112.) Sand has not offered any analysis or research supporting this position. It is ipse dixit.

law (Category 2).  Sand is not a legal expert, and her analysis of the six factors that weigh in favor or against the existence of a trade secret is improper and without methodological basis.  While several paragraphs in this section of her opinion are proper testimony (such as her explanation of the need for flavor and aroma technologies, (Sand Decl. ¶ 52), or her explanation as to shelf life, (id. ¶¶ 59-65)), the vast majority of paragraphs 32-88 are improper attempts to demonstrate that ST's technology qualifies under the law as a trade secret.  The Court will not allow testimony on an ultimate issue of the case from an expert, as this invades the province of the judge and the jury.  While Sand may offer an opinion as to how unique or valuable ST's technology is within the industry, she simply may not offer the legal conclusion that the technology is a trade secret.  Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

Further, a stunning portion of Sand's testimony (Categories 3, 5, and 6) is inadmissible factual narrative—and speculation—regarding Pepsi's actions and motivations, as well as those of Coke.  Sand not only recounts events that occurred—using deposition testimony and documents for support—but also purports to assign motives and draw conclusions wholly outside her expertise.  For example, she claims that "Pepsi did not enter into the agreements [with ST] in good faith," but instead used ST "to get information that would allow Pepsi to commercialize the technology 'in-house,'" as evidenced by a "tone" "within the Pepsi documents." (Sand Decl. ¶ 26.)  It is inappropriate for experts to become a vehicle for a factual or

speculative narrative that simply accumulates and puts together pieces of a story. See Highland Capital Mgmt., 551 F. Supp. 2d at 187; In re Rezulin Prods. Liability Litig., 309 F. Supp. at 551. Acting simply as a narrator of the facts does not convey opinions that are based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Moreover, her assertions regarding Pepsi's intentions or motive—for example, that "[e]motions were running undoubtedly high," (Sand Decl. ¶ 84), or that "Pepsi did not enter into the agreements in good faith," (id. ¶ 26)—are inadmissible. See In re Rezulin Prods. Liability Litig., 309 F. Supp. at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). In short, mere narration fails to fulfill Daubert's most basic requirements. See id. In addition, it may easily invade the province of the jury, providing a separate basis for exclusion. See id.

Additionally, the Court excludes Sand's opinions on FDA regulations (Category 7). She fails to provide any support for her assertion that Project Activo would have resulted in a product with no regulatory issues. For example, her assertion that ST would have used "food grade" ingredients does not, on its own and with no explanation of the relevant regulations, demonstrate that no other regulatory issues may have arisen. This is not enough to substantiate her opinions as to the lack of regulatory complications; as such, these opinions are also inadmissible.

Finally, the Court also excludes Sand's supplemental declaration in its entirety. This document focuses on: the need for information within R&D departments; why and how information is shared; Pepsi's patents; and Pepsi's employees. Sand is not an expert on any of these topics, and the bulk of the supplemental declaration is, once again, improper factual narrative. The only section as to which Sand may have expertise—the need for information within R&D departments—is comprised of just one paragraph. That paragraph provides only speculation as to information sharing (of ST's alleged trade secrets) inside Pepsi. (Sand Supp. Decl. ¶ 8.) The rest of the declaration purports to explain <u>Pepsi's</u> information-sharing and R&D process—topics on which Sand is decidedly not a proper expert. As such, this portion of the declaration is also excluded.

C. <u>Expert Testimony</u>[10]

The Court has allowed certain opinions (<u>see</u> Category 1) and excluded others. The list below is not exhaustive of which opinions are admissible or inadmissible. The Court simply offers examples to demonstrate that Sand may opine as to the technology behind aroma integration in packaging only; any testimony Sand may offer at trial must stay within those parameters. She may not offer opinions as to Categories 2-7.

---

[10] The summary set forth herein does not recite every opinion in Sand's report, but rather summarizes the various subjects upon which Sand opines. The Court refers the reader to the full report for a complete statement of her proffered opinions. The Court provides a short summary in this section of issues with various opinions, but these summary rulings should be read in conjunction with the remainder of the discussion <u>infra</u>.

1. Defendants do not challenge Sand's expertise in the area of food product packaging. Her declaration offers a number of opinions on this topic, including descriptions of aroma integration in packaging ("Category 1"). She opines:

   a. "The desire to have aroma integrated in packaging has been much discussed in trade literature." (Id. ¶ 29.) "The need for flavor and aroma technologies spans most of the packaged food and beverage market" and is a "consumer's means of assessing . . . spoilage and product attributes." (Id. ¶ 52.)

   b. ST's technology addreesses two major concerns: shelf life and flavor modification." (Id. ¶¶ 58–65.)

   c. ST's technology is not easily duplicated or acquired by others; the trade secrets are complex and "encompass the ability to develop, refine, and commercialize aromas into packaging." (Id. ¶ 77.)[11]

   d. CDAs and NDAs are common in the packaging supplier industry. (Id. ¶ 48.)

2. Sand's opinions expand well beyond her packaging expertise, however. Her second category of opinions relates to her view as to whether ST possesses legally cognizable trade secrets; portions of these are excludable as they constitute improper legal conclusions, portions because they are factual

---

[11] The Court notes that this opinion, which appears to be within her area of expertise as to what companies have done during the relevant time period or could do, is not followed by any detail explaining her basis. Thus, her opinion does not reflect science or other reasons explaining why ST's alleged technology is not "easily duplicated." Thus, unless she has disclosed some basis for her opinion elsewhere (for instance, her deposition), this opinion too would be excluded.

narrative, portions because she is speculating about Pepsi's employees' states of mind.  Among the opinions offered in this regard is that ST has "trade secrets" under the law.  (Id. ¶ 88.)  ("Category 2").  She opines:

a) As a company, ST has "uniquely integrated research, process development, specific methods, techniques and strategies."  (Id. ¶ 33.)

> Sand provides no comparative basis/methodology for the opinion of "uniqueness," and it is therefore without reliable basis.  The overall vagueness of the statement highlights the issue.

b) "ScentSational's trade secrets are known by Steven Landau, its Chief

c) Technology Officer, and Barry Edelstein, its Chief Executive Officer. ScentSational's independent contractors and board members were given access to limited or no knowledge of ScentSational's trade secrets. . . . Partners in commercializing the technology were restricted in their knowledge as demonstrated by ScentSational's partnership with David Michael in which only information relating to the aroma specification was shared in order to enable aroma encapsulation with polymers."  (Id. ¶ 43.)

> This is improper factual narrative and state of mind testimony.

d) ST has taken "numerous measures to guard the secrecy" of its trade secrets, including entering into confidentiality agreements, limiting disclosure, and using physical and electronic security measures.  (Id. ¶ 44.)

This is improper factual narrative.

e) "ScentSational's trade secrets are not generally known in the food and beverage industry, outside of their business," and existing Pepsi employees—as well as those generally in the product and package development field—had not known of the technology other than being informed by ST. "If Pepsi was not interested in ScentSational's technology or saw no value in it, it would not have entered into multiple confidentiality agreements with ScentSational." (Id. ¶¶ 32, 35; see also id. ¶ 42 (noting that "[o]thers in the industry" viewed ST's technology "as unique and not generally known").)

This is a trade secret case; trade secrets are defined in a very specific manner. Sand's statement is broad, non-specific, and unsupported. It also improperly describes the states of mind of others, specifically of existing Pepsi employees (and nameless others in the "field"). There is also no basis set forth to support the opinion. To be sure, there is a way of presenting an opinion as to what was known versus not known in an industry generally, but it would need to be done specifying (1) the parameters of the industry, (2) the parameters of how what is "known" is evaluated, and (3) a particularized comparison of that body of information to the ST technology. This was not done.

f) ST did not track the amount of money it spent developing its technology, but it spent $25,000 on studies, "paid for and traded in professional favors with manufacturers to get time in their manufacturing plants," and "covered the costs of creating samples to demonstrate its technology." "Based on this information, ScentSational expended significant effort and money to develop its trade secrets." (Id. ¶¶ 72–76.)

This is improper factual narrative.

3. Sand's third category of opinions contains statements as to the value of ST's alleged trade secrets to ST and others in the industry. (Id. ¶ 51) ("Category 3"). In this regard, she again purports to narrate the evidence, characterize Pepsi's state of mind, and speak as an ST percipient witness. Among this category of "opinions" are the following:

a. Pepsi had demonstrated interest since 2001 and Coke had done the same since the "early 2000s." (Id. 66–71.)

This is improper factual narrative.

b. ST's "advoca[ted] the use of its technology" and consumer interest in ST's innovations was strong. (Id. ¶ 51.)

This is improper factual narrative combined with an unknown source or methodology for opinions regarding consumer interest.

c. Parisi testified that ST "was the only one in the industry with this technology" and "was considered a market leader." (Id. ¶ 87.)

This opinion lacks sufficient factual basis; for instance, Sand has not defined the comparison group, how she knows that the group lacks ST's technology, and what benchmark she is using for her hierarchical statement.

d. ST was the "industry leader in aroma-packaging technology" and was featured in trade publications, in textbooks, on Good Morning America, and in Fortune Magazine. (<u>Id.</u> ¶ 90.)

This combines an opinion that lacks proper methodological basis with improper factual narrative. Again, while it is certainly possible for an expert to opine on ST's position in the industry for "aroma-packaging technology," so long as she has explained adequately (1) who else is in the industry, and (2) how she differentiates between the participants' existing technology and ST's such that ST may be properly categorized as an "industry leader."

4. A fourth category of opinions concerns Sand's views as to the commercial viability of ST's technology. (<u>Id.</u> ¶¶ 89–98.) ("Category 4"). As discussed below, this is not an area in which she has demonstrated expertise and includes speculation on actions and views known only to Coke. The opinions encompass statements regarding consumer experience, consumer appetite, marketing decisions, and marketing success that are without any posited methodological framework. Among this category of "opinions" are the following:

26

a. ST's trade secrets "were capable of producing working and
   <u>commercially feasible</u> consumer products and consumer product
   packaging that <u>measurably enhance the consumer experience</u>" as early
   as 2001. The complexity and variety of flavor samples demonstrate
   that the "working prototypes were at a high level of functionality." As
   of December 2005, they were between the post-pilot plant and
   commercially viable stage. (<u>Id.</u> ¶ 89; <u>see also</u> <u>id.</u> ¶ 95 (describing the
   advanced level of ST's prototypes); <u>id.</u> ¶ 97.)

   This opinion mixes many concepts: whether ST's technology
   could have produced a "working" product might be acceptable if
   meant only technically, but Sand lacks the expertise to discuss
   the full array of what is included with the concept of
   "commercial feasibility." Plainly, Sand assumes the concept
   includes commercial release as well as commercial acceptance
   and success. Accordingly, there are aspects of
   "commercialization" as she uses them that include marketing
   feasibility as to which Sand lacks requisite expertise. She does
   not, for instance, have extensive demonstrated experience in the
   consumer launch or marketing of novel products or
   characteristics. Moreover, she provides no methodology or basis
   for her statements, including those regarding the consumer
   experience, what the "experience" was before, and why this

"enhances" it.  For instance, the only consumer studies she discusses were those performed by ST and Pepsi, but rather than explain how either study supports her conclusions, she compares the studies only to argue that Pepsi's was inferior. (Am. Compl., Ex. C.)  She also cites a study by Coke that presented a "consumer preference around 70%," but does not offer any analysis whatsoever to support an assertion that this number is reliable.  (<u>Id.</u> ¶ 149.)

b.  Pepsi knew of ST's technology's commercial viability by 2001, (<u>id.</u> ¶ 89), and Pepsi's requests for ST prototypes "as recently as December 2014" demonstrates the commercial viability of ST's technology, (<u>id.</u> ¶ 94).

This is improper speculation into Pepsi's state of mind, comined with improper factual narrative.

c.  Project Activo was more likely than not to be commercialized and would have resulted in "considerable profits," as well as "notoriety that would result in further business [for ST] in the food and beverage arena."  (Sand Decl. ¶ 24; <u>see also</u> <u>id.</u> ¶ 129.)

This statement appears to be pure speculation; Sand lacks requisite expertise in the marketing side of commercialization; she provides no methodology other than <u>ipse dixit</u> for her view

that it was "more likely than not" that a product would have been commercialized.

d. A 35% likelihood of success is "high within the food industry" and equates to a "quite high" likelihood of success. (Id. ¶ 132.)

This is ipse dixit; Sand offers no methodology or basis for this view that "35%" is "high" within the food industry.

e. Alignment between Coke and ST was "high," the project was advanced, and the research was "meeting a consumer need that had not been commercialized but was much needed within the industry." (Id. ¶ 24; see also id. ¶ 30 (noting that "ScentSational and Coke were clearly well aligned"); id. ¶ 130 (noting the importance of alignment for implementation of projects like Activo).)

Sand bases a number of opinions on commercialization largely on her view as to the "alignment" between Coke and ST. However, she never describes any method whereby one is able to assess a degree of "alignment," and how that reasonably ties into successful commercialization. In other words, "alignment" could mean no more than that the parties get along well and are proceeding along an investigatory path. There is no necessary reason why "alignment" and successful investigatory outcomes, let alone successful commercialization, would necessarily follow.

This leap between alignment and commercialization therefore
takes a precondition and transforms it into a causal factor.

f.  Commercialization was "forthcoming within 12 months," a "very
narrow timeframe for a launch of this size for the food industry."  (Id. ¶
27.)  However, "Coke's production schedules are unknown," (id. ¶ 140),
and the flavors for the non-orange juice products had yet to be
developed, (id. ¶ 145).  (See generally id. ¶¶ 139–58.)

The opinions are without any methodologized basis and are
therefore ipse dixit.  It is also internally contradicting as it
references certain unknowns but nonetheless opines on a high
degree of commercial success on a known timeframe.

g.  "Coke could conservatively begin its staged launch of Minute Maid into
one US market by October 2012," and a worldwide launch for 100% of
the market would be viable by October 2015.  (Id. ¶ 146.)

Sand provides no basis for this view of Coke's manufacturing
launch let alone marketing launch, consumer acceptance,
regulatory clearance in foreign jurisdictions, roll out in foreign
jurisdictions including production capabilities, scalability in
foreign jurisdictions, or consumers' preference and acceptance in
foreign jurisdictions.

5.  A fifth category of opinions contains factual narrative regarding the relationship
between ST and Coke ("Category 5").  Sand attempts to detail the agreements

and communications between ST and Coke, as well as state, as a matter of fact, the reason for which Coke cancelled Project Activo. Among this category of "opinions" are the following:

a. Coke "turned to" ST for expertise in 2004 for a bottled water project and in 2010 for their juice products, leading to the Fanta project as well. (Id. ¶ 40.)

This is improper factual narrative.

b. Coke signed its agreements with ST in good faith. (Id. ¶ 26.)

This is improper opinion testimony on the entity's state of mind.

c. ST was operating under an exclusivity agreement with Coke, so it was "foregoing other potential opportunities." (Id. ¶ 138.)

This is improper factual narrative and, if no other marketing opportunities existed, pure speculation.

d. The reason Coke provided for canceling its projects with ST was that "Pepsi was pursuing patents that covered what Coke, ScentSational, and their flavor partner (David Michael) knew to be ScentSational's trade secrets," (id. ¶ 24), and "[w]hen it appeared that Pepsi was going to patent the technology, Coke's trust in ScentSational was damaged," (id. ¶ 25). ST was told "verbally and in writing" that the cancellation was due solely to "an IP issue related to Pepsi applying for patents that included ScentSational's trade secrets, . . . destroy[ing] the

advantage that Coke thought it would have with an exclusive edge in the industry." (Id. ¶ 27.)

> This is improper factual narrative and characterization of the evidence.

6. A sixth category of opinions contains narrative regarding Pepsi's actions and motivations during and after its relationship with ST ("Category 6"). Sand argues that Pepsi's agreements with ST were motivated by a desire to steal trade secrets, and she states claims as to Pepsi's inability to develop its own technology. Among this category of "opinions" are the following[12]:

    a. Pepsi had various forms of physical and electronic security in place for its own trade secret information. (Id. ¶ 50.)

> This is improper factual narrative; she is not an expert in security.

    b. Pepsi viewed ST's alleged trade secrets as novel beginning in 2001, (id. ¶ 34), and "thought that aroma technology was a valuable investment and that it could give it a competitive advantage," (id. ¶ 54). Pepsi also "considered use of ScentSational's trade secrets for at least six separate and distinct projects" relating to various beverage products. (Id. ¶ 53.)

---

[12] Sand's supplemental declaration is also largely an attempt to serve as a vehicle for additional factual narrative as to the actions of Pepsi's employees. Accordingly, it is precluded as well.

This is improper speculation as to Pepsi's state of mind as well as improper factual narrative.

c. The fact that Pepsi signed confidentiality and development agreements with ST indicates that ST's "technology was not [previously] known to Pepsi, which is a major global food company," indicating that Pepsi "desired to obtain confidential and/or trade secret information" from ST. (Id. 35; see also id. ¶ 36 (noting that Pepsi has a "reputation for development efforts," but was not previously familiar with ST's technology); id. ¶¶ 45–47, 78.)

This is an improper speculation as to Pepsi's state of mind, its desires, and its knowledge, and it potentially embeds improper factual narrative.

d. "Pepsi did not enter into the agreements [with ST] in good faith," but instead used ST "to get information that would allow Pepsi to commercialize the technology 'in-house,'" as evidenced by a "tone" "within the Pepsi documents" which demonstrates that "ScentSational was there for Pepsi to use." (Id. ¶ 26.)

This is improper speculation as to Pepsi's state of mind, improper characterization of the evidence, and improper linguistic/psychological testimony linking "tone" to alleged activities.

e. ST shared information with Pepsi in reliance on the CDAs, but Pepsi "did not follow the norm in internalizing ScentSational's trade secrets and appears to have an unusual approach to others' IP. One Pepsi presentation relating to aroma shows a bank robber and encourages employees to 'Steal Shamelessly to Create Competitive Advantage.'" (Id. ¶ 49; see also id. ¶¶ 56–57; id. ¶¶ 116–22 (noting that Pepsi engaged in unauthorized sharing of ST's confidential information, and its culture "seemed to internalize confidential information," rather than attributing it to ST).)

> There is no methodology or basis for the statement regarding some "norm" for "internalizing" trade secrets; it is also improper factual narrative and characterization of the evidence.

f. Pepsi knew and disseminated the ST "process, technique and strategy" in meetings and through other modes of communication between 2001-2010. (Id. ¶ 79.)

> This is improper opinion as to Pepsi's state of mind, improper narrative, and improper characterization of the evidence.

g. In 2008, Pepsi budgeted over $1 million for expenses and capital for the aroma project with ST, reflecting "the stage of the project being funded the proven ScentSational technology, and who was paying for the costs." (Id. ¶¶ 54–55; see also id. ¶ 86.) More funding was to be

34

procured once further consumer testing and compatibility assessments were completed.  (Id. ¶ 55.)

This is improper factual narrative.

h.  $1 million "would have been ample" for the production assessments and consumer testing.  (Id. ¶ 55.)  The "funding outlay would have made the return on investment favorable for funding," due to the "proven nature of ScentSational's technology."  (Id. ¶ 55.)

This is improper opinion that is outside Sand's area of expertise, as she has demonstrated knowledge of neither the financial aspects of production assessments and consumer testing in the market area at issue (or another market) or consumer testing generally, nor on the inputs to returns on investment in this area.

i.  Pepsi was incapable of moving the aroma initiative forward and asked ST "to manage what would typically be a Pepsi role."  (Id. ¶ 123–26.) Pepsi employees "appeared to grab information with no connection to its source"—which is "reflective of the Pepsi culture"—and "appeared to be always in the gaining information mode vs working with ScentSational to commercialize its trade secrets."  (Id. ¶¶ 123–24.)

This is improper factual narrative and/or opinion as to Pepsi's employees' state of mind.

j. Pepsi was "unable to duplicate the work of ScentSational," though a number of prototypes were created beginning in late 2007 or early 2008. (Id. ¶¶ 80–81.) For example, Pepsi did not understand what was necessary to "develop and commercialize aromatic packaging," as evidenced by, inter alia, its use of formaldehyde and experimentation with gelatin. (Id. ¶¶ 82–83.)

> This is improper factual narrative, speculation regarding Pepsi's state of mind, and characterization of the evidence.

k. Hal Green questioned why Pepsi was not developing its own aroma technology in May 2009 and "seemed unaware" of the confidentiality agreements. "Emotions were running undoubtedly high at Pepsi in 2009 due to the $35 million dollar folly with Tropicana," and Pepsi's requests for prototypes at that time suggest that "Pepsi was still unable to produce [them] and instead needed ScentSational's prototypes . . . ." (Id. ¶ 84.)

> This is improper factual narrative, speculation, and opinions as to Pepsi's employees' state of mind.

l. It was "well known by Pepsi" that ST had the ability to produce working prototypes while Pepsi did not. (Id. ¶ 93.) ST supplied a number of prototypes between 2001 and 2010 at Pepsi's request, demonstrating that "Pepsi did not have this technology internally." (Id. ¶¶ 93–94.)

This is improper factual narrative and speculation regarding Pepsi's employees' knowledge.

m. Pepsi "would not have spent the time, money, and effort to file . . . patent applications" unless "[t]he inventors of the Pepsi patent applications and their patent counsel . . . believed that the technology claimed . . . was not generally known in the industry." (Id. ¶ 37.) Further, Sand notes that Pepsi "internal documents" state that aromatic packaging technology is a "new and novel concept," and that Pepsi conducted tests of the concepts. (Id. ¶ 38.)

This is improper speculation as to Pepsis employees' state of mind, as well as improper factual narrative.

n. The '637 patent "bears a strong resemblance to confidential information shared in the 2010 meeting." (Id. ¶ 84; see also id. ¶ 85.) Sand provides no basis for this opinion or methodology supporting her conclusions.

7. A seventh and final category of opinions offered by Sand includes her discussion of FDA approvals of ST's technology and materials ("Category 7"). Among these opinions are the following:

a. ST's technology and additives will not violate FDA regulations. (Id. ¶¶ 99–100, 102–06.)

To the extent Sand has the requisite expertise, she fails to provide any analysis.

b. The regulatory concerns raised in depositions in this matter

misunderstand FDA requirements or ST's technology. (Id. ¶ 114.)

Again, Sand fails to provide any analysis.

c. There "would not have been any regulatory concerns with

commercialization of the Coke project" (that is, Project Activo) because

ST "always used food grade ingredients and made this a specification

for the project." (Id. ¶ 112.)

Sand fails to set forth any analysis as to why "food grade"

ingredients would have been sufficient to satisfy all regulatory

issues.

IV.   WAYNE A. HOEBERLEIN

Hoeberlein's expert opinion estimates the amount of damages ST incurred

due to the failure of Project Activo. His analysis relies entirely on Sand's opinion

that Project Activo was more likely than not to be commercialized. As such, because

her opinion is inadmissible, so too is his.

A. Background

Hoeberlein is a Managing Director at Berkeley Research Group ("BRG"), a

Certified Public Accountant ("CPA"), and a member of the American Institute of

CPAs. (Hoeberlein Decl. ¶ 6.) BRG carries out financial, economic, and accounting

research and consultant services, and Hoeberlein has testified in numerous

intellectual property cases. (Id. ¶ 7.) He received a Bachelor of Business

Administration in Accounting from Hofstra University and a J.D. from Hofstra

University School of Law.  (Id. ¶ 6.)  He previously served as a Managing Director at three other firms—UHY Advisors, Aon Consulting, and Kroll.  (Id.)  He was also previously a member of a litigation consulting firm, Hoeberlein Associates.  (Id.)  He was employed by Arthur Andersen for about nineteen years, for ten of which he was a partner.  (Id.)

Hoeberlein was retained by ST to assess the nature of ST's damages associated with Pepsi's alleged misappropriation of trade secrets.  (Id. ¶ 5.)  His opinions rely heavily on those of Sand, as his assessment of damages assumes— with little basis—that Project Activo would certainly have been commercialized.

B.  Expert Testimony

Hoeberlein's declaration states that in the event Pepsi is found liable for any of the causes of action, ST would have achieved a lost profit of approximately $73.4 million for Project Activo, excluding interest.  (Hoeberlein Decl. ¶¶ 13-14.)  After providing background on ST and its relationships with Coke and Pepsi, as well as an overview of Pepsi's patent applications, (id. ¶¶ 16-115), Hoeberlein then discusses the benefits and use of scented packaging, (id. ¶¶ 116-128).  After all of this background—indeed, this section comprises the bulk of his declaration—he offers his opinion as to damages.

To first determine the value of ST's alleged trade secrets, Hoeberlein relies on Coke documents that explain the important of a consumer's sensory experience.  (Id. ¶¶ 131-33, 135-36.)  He next repeats deposition testimony that ST's technology is "'innovative,' worked and could be commercialized."  (Id. ¶ 139.)  From this,

Hoeberlein concludes that the ST, Coke, and Pepsi studies, as well as ST's commercial success and third party statements, are "indicative of the value of [ST's] trade secrets and/or confidential information," (id. ¶ 140), and that it is reasonable to expect that Pepsi's alleged misappropriation of trade secrets diminished the information's value, (id. ¶ 141). He then repeats information learned from depositions that, due to Pepsi's patent applications, ST lost business with Coke. (Id. ¶¶ 142-44.)

To determine the amount of lost profits, Hoeberlein relies on Sand's conclusion that Project Activo "more likely than not would have been successful" if not for Pepsi's patent application. (Id. ¶ 146-47.) He similarly discusses Gibbs's estimation that Project Activo was 35% likely to succeed, though he claims that it is likely higher than this, "given Mr. Gibbs' focus on elements of the project that were expected to be accomplished as part of Phase 2." (Id. ¶ 148.) He nonetheless relies on Sand's assertion that a 35% chance of commercialization is high within the industry and her projected timelines regarding Project Activo's rollout. (Id. ¶¶ 148-52.) He also relies on Sand's estimate that ST's technology would have remained in use by Coke for about seven years. (Id. ¶ 153). Ultimately, using Sand's assertions, he projects profits from Project Activo to be $2.4 million in the United States and $70.9 million outside the United States over seven years. (Id. ¶¶ 154-56.)

C. Discussion

Hoeberlein's opinions rely entirely on Sand's opinions; as discussed earlier, Sand's opinions on commercialization are, inter alia, unreliable and not supported

40

by any clear data or methodology. Like Sand, Hoeberlein also claims that but for Pepsi's patent application, Project Activo "more likely than not would have been successful." (Id. ¶ 98.) Hoeberlein converts Sand's assertion that Gibbs's 35% likelihood figure is "high" into a 100% chance of Project Activo's success—with no reason to do so. This opinion is outside his area of expertise and unsupported by evidence. Furthermore, he boldly concludes that ST also "lost other potential opportunities that are unquantifiable." (Hoeberlein Decl. ¶¶ 169-79.) There is no attempt to identify these "opportunities," and Hoeberlein explained that he could not "imagine what information could come to light that would allow [him] to do that." (Hoeberlein Dep. at 205:7-17.) This obvious speculation must be excluded.

But perhaps more fatal is that, relying on Sand, Hoeberlein assumed Project Activo was 100% likely to be commercialized. He utilized this assumption without taking into account ST's business, past performance, or the market as a whole. (See Hoeberlein Dep. at 112:7-16, 112:24-113:21, 121:9-23, 140:8-14; 165:4-168:13.) He ignored the costs ST expected to incur as well as ST's historical performance, did not account for any risk that Project Activo might not be commercialized, assumed (without evidence) that it would be commercialized worldwide for seven years, and did not provide any discount analysis. There is no analysis to support these assumptions; they appear to be "unsupported speculation." Daubert, 509 U.S. at 599. Additionally, New York requires that lost profits projections be "capable of proof with reasonable certainty"; that is to say, damages calculations "may not be merely speculative, possible or imaginary." Trademark Research Corp. v. Maxwell

41

Online, Inc., 995 F.2d 326, 332 (2d. Cir. 1993). In assuming worldwide commercialization, Hoeberlein relied on Sand's (unsupported) assertion that the project would launch outside the United States by March 1, 2014. (Id. Ex 5, n.1-2.) He does the same for the United States launch. As discussed above, Sand's timelines are rank speculation; Hoeberlein cannot rely on them to state an opinion as to lost profits. Moreover, his reliance on a 100% chance of commercialization is irresponsibly speculative, as no evidence suggests this likelihood of success.

Independently of his reliance on Sand, however, Hoeberlein's opinion still fails to survive the instant motion. Hoeberlein's opinions are unreliable, as they are unsupported by trustworthy data; he offers very little information to support the inputs for his calculations. His models of profit projections ultimately rely on revenue projections made by ST executives in an email regarding what they hoped to make on Project Activo. (Def. Ex. 20.) Additionally, the projected manufacturing costs used by Hoeberlein rely on ST communications with a third-party supplier, which Hoeberlein agreed could not be the "actual final price." (Def. Ex. 33 at 44; Hoeberlein Dep. at 173:16-174:11.) Hoeberlein points to no "sales data or independent market report indicating that the business venture could make sales and be profitable." Ho Myung Moolsan, 2010 WL 4892646, at *10. Simply put, his data points are untested; analysis of lost profits must rely on more than conversations with a plaintiff's executive and internal emails regarding the hoped-for revenues. See Schonfeld, 218 F.3d at 173.

All told, Hoeberlein's opinions are excluded in their entirety. Paragraphs 16-128 are improper factual narrative and a restatement—with no independent analysis—of much of Sand's opinions. (See, e.g., Hoeberlein Dep. 92:3-23.) The rest of his declaration, which goes to lost profits, relies on Sand's unsupported opinions and speculations by ST executives; they are thus unreliable.

V.    CONCLUSION

For the reasons set forth above, Pepsi's motion to exclude the opinions and testimony of Dr. Claire Sand is GRANTED in part and DENIED in part. Any portion of Dr. Sand's opinions relating to Categories 2, 3, 4, 5, 6 or 7 are excluded. Its motion to exclude the opinions and testimony of Wayne Hoeberlein is GRANTED in full. The parties are DIRECTED to meet and confer as to exactly which paragraphs of Sand may remain; other opinions may be provided with the parameters of the Court's ruling herein.

The Clerk of the Court is directed to terminate the open motions at ECF Nos. 149, 150, 151, and 152. The parties are directed to inform the Court **within two days** whether they intend to supplement or amend any filings with regard to the pending motion for summary judgment (ECF No. 184) and, if so, submit a prompt schedule for doing so.

SO ORDERED.

Dated:      New York, New York
           February 14, 2018

                                            KATHERINE B. FORREST
                                    United States District Judge