UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

SCENTSATIONAL TECHNOLOGIES, LLC,

                              Plaintiff,

           -v-

PEPSICO, INC., PEPSI-COLA TECHNICAL
OPERATIONS, INC., THE QUAKER OATS
COMPANY, STOKELY-VAN CAMP, INC.,
TROPICANA PRODUCTS, INC.,

                         Defendants.

------------------------------------------------------------- X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>May 23, 2018</u> |

13-cv-8645 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

     On December 5, 2013, plaintiff ScentSational Technologies, LLC ("plaintiff or "ST") filed this action against defendants Pepsi, Inc., Pepsi-Cola Technical Operations, Inc., The Quaker Oats Company, Stokely-Van Camp, Inc., and Tropicana Products, Inc. ("Pepsi" or "defendants") alleging, <u>inter alia</u>, trade secret misappropriation. According to plaintiff, Pepsi misused a potential business relationship with ST to learn ST's trade secrets, which it then included in a patent application, the publication of which caused Coca-Cola ("Coke") to terminate a project it had with ST ("Project Activo"). Plaintiff seeks in excess of $70 million in lost profit damages.

     Plaintiff's narrative elides facts inconsistent with its claims, including that at the time Coke canceled Project Activo, a number of milestones necessary to technical development and commercial launch had yet to be attained. The

uncontested facts demonstrate that Project Activo had been structured as a phased project, each phase comprising multiple steps: Phase 1 focused on research and development of the technology, and Phase 2 concerned commercialization and marketing issues.  The project never made it to Phase 2.

An October 2, 2017 decision issued by the Honorable Kenneth Karas, to whom this matter was initially assigned, narrowed the case.  In that decision, the Court dismissed plaintiff's damages claim relating to a separate project with Coke and its common law claims.  (ECF No. 136.)  The case was transferred to the undersigned on September 28, 2017.  (ECF No. 134.)

Plaintiff's remaining claims include misappropriation of trade secrets (Count I); four separate contract claims (Counts II-V) for alleged breaches by Pepsi of various confidentiality agreements; and a correction of inventorship claim (Count IX).  (ECF No. 33, Am. Compl.)  By separate opinions and orders, this Court has previously precluded plaintiffs' three expert witnesses pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).[1]

Defendants have now moved for summary judgment on all remaining claims. (ECF No. 184.)  For the reasons stated below, the Court GRANTS that motion.

I.   BACKGROUND

The following facts are undisputed unless stated otherwise.

---

[1] The Court granted the motions to exclude Wayne A. Hoeberlein and Keith R. Cadwallader in their entirety; it granted the motion to exclude Dr. Claire Sand in part.  (ECF Nos. 191, 229.)

ScentSational Technologies, LLC is the successor company to ScentSational Products, Inc. (together, "plaintiff," "ScentSational" or "ST"), which was founded in 1997 by Steven Landau ("Landau").  (ECF No. 136 at 2; see also Harper Decl. Ex. 23.)  ST's primary focus is the invention and commercialization of aroma release food and beverage packaging (that is, the development of a method to deliver scents in packaging so as to alter a consumer's taste perception).  (Id. at 2-3.)

While its description of the trade secrets at issue in this lawsuit have been a moving target and without significant written evidentiary support, plaintiff alleges that it owns a number of combination trade secrets related to the development and commercialization of scented packaging.[2]  (ST's Response to Defs.' Statement of Undisputed Material Facts ("56.1 Statement") ¶¶ 1-2.)  Between 2001 and 2011, ST and Pepsi entered into four confidentiality agreements governing the disclosure of confidential information.  Over this period, they discussed potential business arrangements relating to ST's technology.  Ultimately, the parties never finalized a deal.

According to Pepsi, at the same time it was considering utilizing ST's aroma release technology, it was actively pursuing parallel in-house development.  Pepsi subsequently filed three patent applications: the first application (the "'245 Application" or the "March 2010 Application") was published on March 4, 2010; the second application (the "'909 Application") was published on January 12, 2012 and

---

[2] While the number of alleged trade secrets that were disclosed has varied while this action has been pending, ST is now prosecuting the disclosure of eleven alleged combination trade secrets.

the patent issued on July 2, 2013 (the "'637 Patent"); and the third application (the

"'551 Application") was published on March 7, 2013.  (Harper Decl. Exs. 17-19.)  The

inventions reflected in Pepsi's patent applications have never resulted in a

commercialized product.[3]

In March 2010, ST met with Coke to discuss how its technology could benefit

Coke's beverage products.  In August 2010, ST and Coke executed a Master

Agreement (the "Agreement") for External Professional Services for a project

entitled "Project Activo."  This project was intended to explore methods by which ST

could apply its technology to Minute Maid juice containers.  (56.1 Statement ¶ 24;

see also Harper Decl. Exs. 8, 9.)  ST and Coke focused on using a

microencapsulation spray on Minute Maid closures and liners.  (See, e.g., Harper

Decl. Ex. 9; Garner Decl. Ex. 252.)  Notably, the Master Agreement did not

"constitute a commitment on behalf of [Coke] to award any work to [ST]."  (Harper

Decl. Ex. 8.)  The Agreement specified that ST would "provide professional services

to [Coke] related to the development of an aromatic closure as [Coke] may

authorize, from time to time, by the execution of a Statement of Work . . . signed by

both parties . . . ."  (Id.)

Project Activo was designed with two phases in mind, but the parties

executed a statement of work for Phase 1 only.  This first phase focused on initial

---

[3] The parties disagree on the reason for this failure.  Pepsi claims that it was not commercialized
because of the cost and lack of consumer demand; ST claims that the failure is due to Pepsi's
inability to develop a feasible delivery system.  In all events, the parties do not dispute that they
together never commercialized a product and that the reason for such failure was business related
and not the result of alleged unlawful conduct.

4

prototype development.  (Harper Decl. Ex. 8.)  ST was engaged to provide Coke with

up to 10,000 prototype units in each flavor profile.  (Id.)  ST encountered several

technical issues during Phase 1.  Some of the early samples it sent to Coke for

testing were inconsistent and contained off-notes (for example, a "burnt plastic

note").  (Harper Decl. Ex. 10 at 11.)  ST also experienced problems with dispersion—

the material was "beading up, similar to water on a newly waxed car," (id. at 14)—

and encountered difficulty ensuring that the aroma-containing microencapsulate

would adhere to product packaging when exposed to water.  (Harper Decl. Ex. 11.)

Phase 1 was scheduled to terminate on July 19, 2011.  To proceed further, the

Master Agreement required that the parties (ST and Coke) execute a separate

statement of work governing Phase 2.  No such statement of work was ever signed.

In July 2011, ST sent Coke a proposed development agreement for Phase 2. (Id.)

Landau, for ST, and Carlton Gibbs, Coke's project leader for Project Activo, spoke

the next day about moving the project forward.  (Id.)  In response to an email from

Landau summarizing the contents of that phone call, Gibbs stated that not only was

there not yet an agreement on Phase 2, but that the technical work on Phase 1 also

remained incomplete:

> Thank you for sending your notes of the call to me.  However,
> there needs to be clarification on our conversation concerning Phase I.
> Phase I expectations were to evaluate that the aroma translated
> well through your process and maintained its stability in the presence
> of water.  As we discussed in our face to face meeting in Atlanta, the
> KO team would make [the] decision to move forward or not into Phase
> II development if pending successful results.  Our policy has always
> been that both parties sign the agreement as a way of accepting the
> terms of the agreement.  We have NOT signed the Phase II agreement
> at this time.  In relation to the cost questions, Phase I was to

understand the coating weight ranges that would provide us guidance
on the optimal coating weight.  Based on Scientific method and
principle the supplier is expected to record these weights during their
process.

Based on our conversation today this has not been done by
ScentSational, and my request was that we need to continuously
validate decisions with data from any 17 testing that is being
completed.  I am concerned at this point, because any request of data
collection from ScentSational has resulted in lengthy email responses,
that are not addressing the simple providing [sic] the data requested.
In short, my request is simply for the data collected in Phase I so that
we are able to track all changes being made.  The data will be used as
history for any future quality records.

(Harper Decl. Ex. 11 at 5.)  On July 22, 2011, ST supplied Coke with additional

information including an estimated cost per unit. (Harper Decl. Ex. 14.)

Plaintiff's position in this lawsuit is premised on a view that not only was

Phase 1 complete, but that Phase 2 was certain to proceed and commercialization

was certain to be successful.  In this regard, plaintiff attempts to defeat summary

judgment by proffering several self-serving notes and memoranda of conversations

and meetings with Coke.  As discussed below, to defeat summary judgment,

plaintiff must raise a triable issue based on admissible evidence.  It has failed to do

so.  For instance, in support of its position that Coke remained committed to Project

Activo at this time, plaintiff proffers an email consisting of multiple levels of

hearsay.  In an email dated August 11, 2011, ST's principal, Landau, stated to

another ST employee that he had spoken with Coke's Gibbs, who in turn had

spoken with the Vice President of Coke's juice team.  Gibbs allegedly told Landau

that the Coke Vice President had said that he or she was "fully on board" with

Project Activo and that the products were likely to be sold globally.  (Garner Decl.

6

Ex. 262.)  The multiple levels of hearsay in the email render it inadmissible.  It would be precluded at trial and cannot, therefore, form the basis for a triable issue. It provides, in short, no basis for any fact that Coke's juice team was fully on board or the truth of a potential geographic launch as being "global."

It is also indisputable that, as of August 2011, much work needed to be done, and done successfully, before a product using any of ST's aroma microencapsulation technology could be launched.  ST had only demonstrated its technology through hand-sprayed samples—which Coke's Gibbs testified was not a viable method for large-scale commercial production.  (Id. at 230:13-25.)  Without evidence that the technology could be produced on a commercial scale, Coke was unwilling to move forward.  (Id. at 233:2-234:1.)  Meetings between plaintiff and Coke continued into September 2011.  Notably, at this point, the Phase 1 statement of work had expired by its terms and no Phase 2 statement of work had been finalized.

On September 12, 2011, ST met with Gibbs and other Coke employees to discuss Phase 2.  (Garner Decl. Ex. 264.)  Here, again, plaintiff presents notes from an ST employee (Landau or someone else) that state that the "project currently has satisfied the requirements of Phase 1 development."  (Id. at 2.)  Again, no admissible evidence has been presented to confirm this fact.  In contrast, Coke's Gibbs has testified at his deposition, and presumably would at trial, that ST and Coke "never came to a final agreement on the technical requirements for Phase 2." (Def. Ex. 12 ("Gibbs Dep.") at 225:2-6.)

Following this September 12, 2011 meeting, plaintiff's list of "to do" items yet to be accomplished included, <u>inter alia</u>:

- "Simulation of process defining machinery requirements and [an] outline [of] all change parts for production equipment for spray system";

- "Validation of spray-ability, adhesion, fracturing of microencapsulated adhesive to meet the project requirements";

- "Evaluation and validation of spray time and drying time";

- "[U]nderstanding of spray accuracy, issues with potential over spraying, potential effect on conveyer systems and cost"; and

- "[S]pecification . . . for label, closure, and bottling line."

(Garner Decl. Ex. 264 at 3.)  Additionally, plaintiff's list noted that the spray machinery's ability to match accuracy and speed requirements had not yet been established, and that the budget allocation had not yet been finalized.  (<u>Id.</u> at 4.)[4]

The above facts raise significant uncertainty as to the viability or success of the project were in place prior to the event that plaintiff asserts caused Project Activo's failure: the legal hold imposed on September 20, 2011.  On that day, ST received an email from Coke's legal department stating that "Legal has put [the project] ON HOLD indefinitely until [it] ha[d] an opportunity to fully review the current agreements."  (Harper Decl. Ex. 15.)

---

[4] While the notes are hearsay and would be inadmissible for the truth of their substance, they do demonstrate that the parties agreed that many items still had yet to be completed at that time.

On November 4, 2011, ST had a conference call with Coke's legal department. (Garner Exs. 267-68.)  During that call, the participants discussed Pepsi's March 2010 Application.  (Id.)  On November 16, 2011, Coke's Gibbs informed ST that Project Activo would not be moving forward "due to the risks that have been identified during the due diligence phase of [Coke's] patent review process." (Harper Decl. Ex. 16.)  Gibbs testified that this "was not just any one patent or patent application that created the risk inconsistent with Coke's IP policies," (Gibbs Dep. at 192:6-17), and that by that time, the relationship "could be going in a direction of deteriorating," (id. at 201:23-202:3).   He further referenced the number of open and unresolved issues discussed above, including insufficient data, a lack of information as to manufacturing equipment and costs, and the rate of application. (Id. at 211:20-212:15.)  No witness from Coke has testified that Pepsi's March 2010 Application was a substantial factor in Coke's decision not to proceed.  At his deposition, plaintiff's counsel asked Gibbs to provide his view of the likelihood that the project would have been commercialized had it proceeded (i.e., had there been no legal hold on the project).  Gibbs estimated a likelihood of commercialization of only 35%.  (Id. at 196:9-23.)  (There are various evidentiary issues pertinent to this "35%" statement that would no doubt be raised in motions in limine if this matter were to proceed to trial.)

In sum, there is no dispute as to the following facts, which are themselves sufficient to grant summary judgment in favor of defendants:

- ST has never commercialized its aroma encapsulation technology with any entity;

- At the time Project Activo was terminated, Pepsi had one pending patent application—which did not itself result in an issued patent;

- Plaintiff itself must view the technology disclosed in this Application as sufficiently different from its own as, throughout this litigation, it has vigorously argued for sealed filings so as not to disclose its trade secrets (versus taking the position that the Application in fact disclosed them);

- Coke and ST's work on Project Activo governed by a written agreement that required completion of steps outlined in statements of work for each phase, (Harper Decl. Ex. 8);

- The only signed statement of work expired its terms in July 2011, well before Coke's decision not to proceed further with the Project;

- As of September 12, 2011, ST's "next steps" focused on scaling the production and application of the technology, as ST had only demonstrated its technology through hand-sprayed samples;

- Coke was unsure whether the project could achieve a commercial scale;

- The record contains Coke's numerous expressions of concern about ST's ability to manufacture and scale its technology; and

- At the time Coke put Project Activo on formal hold, there was no signed or even fully negotiated statement of work regarding Phase 2, (Gibbs Dep. at 225:2-6).

10

II.   LEGAL PRINCIPLES

   A. <u>Summary Judgment Standard</u>

   "The court shall grant summary judgment if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial
burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex
Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party does not bear
the ultimate burden on a particular claim or issue, it need only make a showing
that the non-moving party lacks evidence from which a reasonable jury could find in
the non-moving party's favor at trial.  <u>Id.</u> at 322-23.

   In making a determination on summary judgment, the court must "construe
all evidence in the light most favorable to the nonmoving party, drawing all
inferences and resolving all ambiguities in its favor." <u>Dickerson v. Napolitano</u>, 604
F.3d 732, 740 (2d Cir. 2010).  Once the moving party has discharged its burden, the
opposing party must set out specific facts showing a genuine issue of material fact
for trial.  <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely
on mere speculation or conjecture as to the true nature of the facts to overcome a
motion for summary judgment," as "[m]ere conclusory allegations or denials cannot
by themselves create a genuine issue of material fact where none would otherwise
exist." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations
omitted).

In addition, parties may not defeat summary judgment on the basis of conclusory allegations or assertions; they must offer some hard evidence in support of such factual assertions.  See Hicks v. Baines, 593 F.3d 159, 166 (2d Cir, 2010); Brink v. Union Carbide Corp., 210 F.3d 354 (2d Cir. 2000) ("Rule 56 provides that any affidavits submitted in opposition to a properly supported motion for summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'")  Accordingly, the evidence proffered by the party opposing summary judgment must be of a type that would be admissible at trial.  Id.  ("Thus, 'hearsay testimony . . . that would not be admissible if testified to at . . . trial may not properly be set forth in [a Rule 56] affidavit.'") (citing Fed. R. Civ. P. 56(e); H. Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir. 1991); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) (a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment ... absent a showing that admissible evidence will be available at trial.")).

B. Misappropriation of Trade Secrets

For a party to succeed on a claim for misappropriation of trade secrets under New York law, it must demonstrate "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means."  Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009) (quoting N.

Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999)); see also

Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173

(2d Cir. 1990).

Trade secrets are a narrow category of confidential information; to prove

ownership of a trade secret, a plaintiff must demonstrate the specific information

owned and its value.  Next Commc'ns, Inc. v. Viber Media, Inc., No. 14-cv-8190,

2016 WL 1275659, at *3 (S.D.N.Y. Mar. 30, 2016) ("New York and Second Circuit

law . . . requires the trade secret claimant to describe the secret with sufficient

specificity that its protectability can be assessed . . . ." (quoting Sit-Up Ltd. v.

IAC/InterActiveCorp., No. 05-cv-9292, 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20,

2008))).  Although there is no one-size-fits all definition to a trade secret, New York

courts generally consider the following factors to determine its contours:

> "(1) the extent to which the information is known outside of the
> business;
> (2) the extent to which it is known by employees and others involved in
> the business;
> (3) the extent of measures taken by the business to guard the secrecy
> of the information;
> (4) the value of the information to the business and its competitors;
> (5) the amount of effort or money expended by the business in
> developing the information; [and]
> (6) the ease or difficulty with which the information could be properly
> acquired or duplicated by others."

In re Document Techs. Litig., 2017 WL 2895945, at *5 (quoting Bancorp Servs., LLC

v. Am. Gen. Life Ins. Co., No. 14-cv-9687, 2016 WL 4916969, at *11 (S.D.N.Y. Feb.

11, 2016)).

Using information "in breach of an agreement or confidential relationship" may constitute misappropriation, <u>Free Country Ltd v. Drennen</u>, 235 F. Supp. 3d 559, 567 (S.D.N.Y. 2016), but a "claim for misappropriation requires bad faith." <u>Ferring B.V. v. Allergan, Inc.</u>, 4 F. Supp. 3d 612, 628 (S.D.N.Y. 2014).

C. <u>Causation & Damages</u>

'There are three types of damages for alleged misappropriation of a trade secret: (1) lost profits (i.e., losses the plaintiff suffered); (2) unjust enrichment; or (3) a reasonable royalty fee for use of the trade secret. <u>LinkCo, Inc. v. Fujitsu Ltd.</u>, 232 F. Supp. 2d 182, 185-86 (S.D.N.Y. 2002). A plaintiff can only recover lost profits if it "demonstrate[s] with certainty that such damages have been caused by the breach"; additionally, "the alleged loss must be capable of proof with reasonable certainty." <u>Kenford Co. v. Cnty. of Erie</u>, 493 N.E.2d 234, 235 (N.Y. 1986). "In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." <u>Id.</u>; <u>see also</u> <u>Wakeman v. Wheeler & Wilson Mfg. Co.</u>, 4 N.E. 264, 266 (N.Y. 1886) ("The damages must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract. They may be so remote as not to be directly traceable to the breach, or they may be the result of other intervening causes, and then they cannot be allowed."). In addition, when a damages claim relates to a new business venture, "lost profits . . . receive[] greater scrutiny because

there is no track record upon which to base an estimate." Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000).

"Loss causation is causation in the traditional 'proximate cause' sense—the allegedly unlawful conduct caused the economic harm." AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 209 (2d Cir. 2000). Thus, in order to hold a party liable for lost profits, a plaintiff must establish proximate causation by the defendant. See Carco Grp., Inc. v. Maconachy, 718 F.3d 72, 82 (2d Cir. 2013) (noting that "lost profits are consequential damages that must be proven with reasonable certainty . . . and a court must make appropriate findings as to proximate cause"); Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 597 (2d Cir. 1996) (noting that special or consequential damages are subject to the rules of proximate cause). If a plaintiff cannot establish "the requisite causal connection between the alleged bad acts and the harm it claims," it cannot survive a motion for summary judgment. Bulldog New York LLC v. Pepsico, Inc., 8 F. Supp. 3d 152, 178 (D. Conn. 2014). "Conclusory allegations, conjecture, and speculation" in this regard "insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

There must be some "direct relation between the injury asserted and the injurious conduct alleged." Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235 (2d Cir. 1999.) That said, a "proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about

the injury."  <u>Hydro Investors, Inc. v. Trafalgar Power Inc.</u>, 227 F.3d 8, 15 (2d Cir.

2000).

 D.  <u>Correction of Inventorship</u>

  "Alleged co-inventors must establish their co-inventorship by facts supported

by clear and convincing evidence.  To meet the burden of clear and convincing

evidence, the alleged co-inventors must prove their contribution to the conception of

the invention with more than their own testimony concerning the relevant facts."

<u>Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n</u>, 383 F.3d 1352, 1382 (Fed. Cir.

2004) (citations omitted).  "Whether the co-inventor's testimony has been

sufficiently corroborated is evaluated under a 'rule of reason analysis,' which

requires that an 'evaluation of all pertinent evidence must be made so that a sound

determination of the credibility of the inventor's story may be reached.'"  <u>Id.</u>

(quoting <u>Price v. Symsek</u>, 988 F.2d 1187, 1195 (Fed. Cir. 1993)).  "Corroborating

evidence may take many forms," including, preferably, "records made

contemporaneously with the inventive process," "circumstantial evidence of an

independent nature," or oral testimony.  <u>Id.</u> (citations omitted).

III. DISCUSSION

  With regards to ST's misappropriation claim (Claim I) and its breach of

contract claims (Claims II-IV), no reasonable juror could conclude that ST has

proven causation or damages.  There is no non-speculative, cognizable evidence that

ST actually stood to profit from Project Activo in the first place, let alone that Pepsi

caused ST's alleged damages.  Accordingly, defendants are entitled to summary judgment.

A.  <u>Causation</u>

ST's entire case is premised on the assumption that in the absence of Pepsi's March 2010 Application, Project Activo would have been commercialized and would have been wildly and globally successful.  The uncontested record evidence, however, demonstrates that there were a number of reasons for Project Activo's termination.  In the face of such evidence, no rational juror could conclude that the legal hold in late September 2011 proximately caused Coke to pull out of Project Activo.  That evidence establishes that at the time Coke raised the March 2010 Application as a concern, the only signed statement of work had already expired and a number of other open technical items remained unsolved.  The Coke employees whose testimony has been presented on this motion have testified that, at the time of its termination, the technical aspects of Project Activo were still in development and that likelihood of commercialization was well below 50%.  Indeed, even the speculation elicited from Gibbs was that the project had only a 35% chance of commercialization, making it more likely than not that the Project would <u>not</u> be commercialized.  (Gibbs Dep. at 196:9-23.)  Notably, Gibbs testified that there was no point at which Coke had agreed to move forward with Phase 2.  (Gibbs Dep. at 200:12-16.)

The evidence demonstrates that before September 20, 2011, Phase 2 was in deep trouble: the Phase 1 statement of work was over and testing results were not

adequate.  Phase 2 never commenced—commercialization of ST's technology was far from a done deal.  "No business unit [within Coke] was committed to the project" nor did they commit "a budget to the product."  (Def. Ex. 7 ("Aranda Dep.") at 67:1-11; see also Gibbs Dep. at 154:23-155:2 (noting that Coke did "not have a committed business unit, and [they] didn't have a committed location, and the negotiation in terms of what funding will be required was not secure.  So a lot of those things—those were a lot of unknowns.").)  A budget allocation from a business unit would have been necessary for a brand to commit to launching the technology.  (Id. at 155:6-156:8.)

In addition, ST's visit to Coke's production facility was for samples (as a part of "setting [a] foundation" for Phase 2)—not for a "final assessment."  (Id. at 220:6-221:23.)  When asked what ST "didn't do in Phase 1 to set that foundation," Gibbs responded that he "need[ed] more data."  (Id. at 222:3-5.)  He testified that, as a result of the lack of data, they "never came to a final agreement on the technical requirements for Phase 2."  (Id. at 225:2-6.)  On July 13, 2011, Gibbs even emailed ST that he was "concerned at this point, because any request of data collection rom Scentsational has resulted in lengthy email responses, that are not addressing the simple providing the data requested."  (Def. Ex. 11 at ST-042338.)

Furthermore, a representative of Encapsys, which was working on Project Activo with ST and Coke, testified that it was concerned about ST's ability, as a company with only $400,000 in revenue at the time, to "manage the supply chain and the inventories," (Def. Ex. 13 ("Goodwin Dep.") at 84:13-19); he specifically

referred to "viability and [whether ST is] going to actually get to revenue" as a "major concern," (id. at 84:23-25).  He also testified that as early as August 2011 (a month before the first email regarding Coke's legal hold), Encapsys was "losing confidence" in Project Activo, (Goodwin Dep. at 86:24-85:7), and that Encapsys viewed ST's technology as "a pretty long way from commercialization," (id. at 70:22-25).

In addition, ST never demonstrated that "they could transfer the technology to a high volume bottling system." (Gibbs Dep. at 229:25-230:3.)  Rather, the technology had only been demonstrated through hand-sprayed samples, which was not viable for a high volume project with millions of units or bottles.  (Id. at 230:13-25.)  Without demonstration that the project could achieve a commercial scale, Coke was unwilling to move forward.  (Id. at 233:2-234:1.)  Goodwin added that the fact the technology was being hand-sprayed in June 2011 indicated that Encapsys "was a long way away from revenue on the project" and that "there [was] still a lot of experimentation underway in the project." (Goodwin Dep. at 72:11-24.)

Furthermore, Coke personnel testified that the Project's cost of commercialization led to additional feasibility concerns.  As early as July 2011 (again, before the legal hold was put in place), the Project "didn't seem feasible" based on the financial data available to Coke.  (Aranda Dep. at 34:3-25.)

Accordingly, ST cannot demonstrate causation; no reasonable juror could conclude that intellectual property issues proximately caused Coke's termination of Project Activo.

B.  <u>Damages</u>[5]

Moreover, ST has not created a triable issue as to the existence or amount of

damages it suffered due to the cancellation of Project Activo—its claim for $73

million is unsupported speculation.  As discussed, it is far from certain that Project

Activo would have been commercialized, even apart from Pepsi's patent application.

But in all events, commercialization was so uncertain that damages built on an

undiscounted view of certain, successful, and global commercialization cannot

withstand scrutiny.  The $73 million in requested damages are more properly

viewed as a lottery ticket.

Plaintiffs' experts were excluded, in large part, because their damage

calculations were not grounded in the evidence.  Plaintiff now references pieced

together snippets of evidence that together amount to a truly speculative inference

of commercial commitment and success.  For example, ST points to a Coke

representative's assertion in an email that "it was a pleasure meeting [ST's CEO]

last week" as an indication that the "commercialization was imminent because the

project was progressing."  (Mem. Opp. at 19.)  This statement simply cannot support

the wight of an inference of commercial commitment.

Notably, ST's argument vis-à-vis damages focuses on the assertion that "ST's

technology was simply an inexpensive upgrade to the cap" and that

"commercialization and implementation would be carried out by large, well-funded,

---

[5] The existence of damages is not an element of a trade secret claim.  However, although plaintiff's
prayer includes punitive damages, it has focused exclusively on actual damages and has not argued
for punitive damages at any point.  In all events, the record does not support the type of conduct that
would allow this Court to charge a jury on punitive damages.

and experience [sic] companies, i.e., Coke, Givaudan, Encapsys and Spray Systems. Thus, the size and strength of ST was irrelevant to the commercialization of Project Activo." (Mem. Opp. at 22.)  It argues that "Coke sells <u>billions</u> of bottles of Minute Maid orange juice around the world every year" and that "for much less than a penny per cap (between $0.0019 and $0.0037 per cap), aroma filled microencapsulates could be sprayed on the caps." (Mem. in Opp. at 21 (emphasis in original).)  This amounts to reargument that commercialization was likely because Coke was handling the mechanics; it adds that, in any case, Project Activo was not a "new" product by ST.

However, nowhere does ST put forth calculations of damages based on record evidence.  It merely states that the quantum of damages equals the profit per cap to ST multiplied by the number of caps, discounted by risk.  It does not put forth clear evidence of the per-cap profit it would reap, or the number of bottles that would have the caps.  It states that it "used 300,000,000 cases, (i.e., 7,200,000,000 unit per year)" in its calculation, (Mem. Opp. at 28), but does not justify this number.  Its only evidence is an email from one ST representative to another that references this number in a table—no explanation is given as to where the number originated.  For all the Court knows, this number was pulled out of thin air.

ST also references meeting notes from April 28, 2010 and an internal Encapsys email from August 11, 2011 to support the "expected size of the initial U.S. launch."  But there is no estimate from any party that is sufficiently non-speculative to support a claim for damages.  A vague statement that a product may

"go global" does not mean that in fact it would have, or that it would have been successful if it did so.  As discussed earlier, it appears that most of those involved in the project did not believe the project would be commercialized, whether at home or abroad.

Equally fatal is ST's failure to account for all of the clearly demonstrated risks in its lost profits calculation.  It fails to address, <u>inter alia</u>: the likelihood Coke would have greenlit Phase 2 but for Pepsi's patent applications; regulatory concerns having to do with commercialization in the United States and abroad; and the likely longevity of the product and technology.

Furthermore, ST's reliance on its other commercialized products, (<u>see</u> Garner Decl. Ex. 152), to demonstrate ST's viability here is misplaced.  The other projects (e.g., aroma desiccant cannisters, trash bags, and mouth guards) are entirely different from the technology for Project Activo.  ST has not demonstrated that evidence of profits from those products can help predict profits from Project Activo in any reliable manner.  And evidence of other unrelated packaging innovations (not by ST), such as Maxwell House aroma spray, a flip-top plastic closure for tooth paste tubes, and smart blister packaging for medications (<u>see</u> Pl. Ex. 454), that remained in the market for decades, without specific comparisons to the innovation here, is not enough to demonstrate likely profit from Project Activo.

Accordingly, ST has failed to present evidence that raises a question of fact as to damages.

C.  Contract Claims

ST also alleges that Pepsi breached the four confidentiality agreements by applying for the patents.  As discussed above, ST has not demonstrated that a question of fact exists as to causation or damages relating to Project Activo's cancellation.  Thus, it also cannot sustain its contract claims relating to the confidentiality agreements (Claims II-V).  An element of a breach of contract claim is the existence of damages.  See Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525-26 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages.  . . .  Damages for breach of contract must be such only as actually follow or may follow from the breach of the contract." (internal quotation and citations omitted)).  Without damages, these claims must also fail.

D.  Inventorship Claim

ST alleges that Landau is the sole inventor of at least some of the '637 Patent's claims.  However, it has put forth no evidence in support of this claim.  It merely compares its allegations regarding its Secondary Cover Trade Secret in the Amended Complaint to the language in the patent—this is not enough to support a correction of inventorship claim.  This is especially so when the evidence demonstrates that ST drafted its trade secrets after Pepsi had applied for its patents (and during this litigation).  There is no deposition testimony from Landau, for example, indicating the specific circumstances of his inventorship, let alone any

documentary evidence.  Accordingly, ST has not raised a question of fact as to inventorship.

IV.    CONCLUSION

Accordingly, defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to close the open motion at ECF No. 184 and to terminate case 13-cv-8645.

SO ORDERED.

Dated:    New York, New York
          May 23, 2018

_____
KATHERINE B. FORREST
United States District Judge